Adam Clayton POWELL, Jr., et al.,
Appellants,

v.

John W. McCORMACK, Speaker of the House of Representatives et al.,
Appellees.

No. 20897.

United States Court of Appeals
District of Columbia Circuit.

Feb. 28, 1968.

As Amended July 30, 1968.

Mr. Arthur Kinoy, New York City, of the bar of the Court of Appeals of New York, pro hac vice, by special leave of court, Messrs. Frank D. Reeves and Herbert O. Reid, Sr., Washington, D. C., with whom Mr. William M. Kunstler, New York City, and Mrs. Jean Camper Cahn, Washington, D. C., were on the brief, for appellants.

Mr. Bruce Bromley, New York City, of the bar of the Court of Appeals of New York, pro hac vice, by special leave of court, with whom Messrs. Lloyd N. Cutler, John H. Pickering, Louis F. Oberdorfer, Max O. Truitt, Jr., and Timothy B. Dyk, Washington, D. C., were on the brief, for appellees.

Messrs. Thomas D. Barr, John R. Hupper and Jay E. Gerber, New York City, members of the bar of the Court of Appeals of New York, were also on the brief for appellee and were granted leave to appear in this case pro hac vice.

Before BURGER, McGOWAN and LEVEN-THAL, Circuit Judges.

BURGER, Circuit Judge.

This case presents for the first time the question whether courts can consider claims that a Member-elect has been improperly excluded from his seat in the United States House of Representatives. On the basis of findings by that body that Member-elect Adam Clayton Powell, Jr., had been guilty of misconduct as a Member of a prior Congress and of contumacious conduct toward the courts of the State of New York, the House voted to exclude him from the seat in the 90th Congress to which he had been elected in 1966 by the voters of the 18th Congressional District of New York.[1]

This suit was brought by Mr. Powell and thirteen voters [2] of the 18th Congressional District of New York in the United States District Court for the District of Columbia. Appellants sought injunctive relief, mandamus, and a declaratory judgment against Appellees who are Members and officials of the House of Representatives of the 90th Congress. Appellees were sued individually, in their official positions, and as representatives of all Members of the House of Representatives.[3] The complaint was accompanied by a motion to convene a statutory three-judge court. The District Court dismissed Appellants' complaint for want of subject matter jurisdiction, Powell v. McCormack, 266 F.Supp. 354 (D.D.C. 1967).

While Appellants' claims actually arose as a result of action taken by the House at the time of the organization of the 90th Congress, the factual genesis of that action derived from events involving the alleged conduct of Member-elect Powell during earlier Congresses. The underlying events were summarized in a House Report as follows:

> During the 89th Congress open and widespread criticism developed with respect to the conduct of Representative Adam Clayton Powell, of New York. This criticism emanated both from within the House of Representatives and the public, and related primarily to Representative Powell's alleged contumacious conduct toward the courts of the State of New York and his alleged official misconduct in the management of his congressional office and his office as chairman of the Committee on Education and Labor. There were charges Representative Powell was misusing travel funds and was continuing to employ his wife on his clerk-hire payroll while she was living in San Juan, P. R., in violation of Public Law 89–90, and apparently performing few if any official duties.

In September 1966, as the result of protests made by a group of Representatives serving on the Committee on Education and Labor, the Committee on House Administration, acting through its chairman, issued instructions for the cancellation of all airline credit cards which had been issued to the Committee on Education and Labor and notified Chairman Powell that all future travel must be specifically approved by the Committee on House Administration prior to undertaking the travel.

The Special Subcommittee on Contracts of the Committee on House Administration, under the chairmanship of Representative Hays of Ohio, conducted an investigation into certain expenditures of the Committee on Education and Labor, which focused primarily on the travel expenses of Chairman Powell and of the committee's staff during the 89th Congress, and the clerk-hire status of Y. Marjorie Flores. Hearings were held on December 19, 20, 21 and 30, 1966, and a

---

1. Mr. Powell was thereafter re-elected to the Congress in the special election called to fill the vacancy determined to exist by reason of his exclusion. He has not since presented himself to take the oath.

2. Appellants are Adam Clayton Powell, Jr., A. Philip Randolph, Percy E. Sutton, Bas-il Patterson, J. Raymond Jones, Lillian Upshur, Hulan Jack, Geraldine L. Daniels, Antonio Mendez, Hilda Stokley, Margaret Cox, Fannie Allison, Charles B. Rangel, and James P. Jones.

3. See pp. 584, 585 *infra*.

report (H. Res. [*sic*] 2349) was filed just prior to the end of the 89th Congress. * * * Subsequent to the report of the Hays subcommittee and prior to the organization of the 90th Congress, the Democrat Members-elect, meeting in caucus, voted to remove Representative-elect Powell from his office as chairman of the Committee on Education and Labor.[4]

The 90th Congress met to organize on January 10, 1967. At that time Member-elect Van Deerlin, of California, objected to the administration of the oath to Member-elect Powell.[5] Upon request, Member-elect Powell stepped aside while the oath was administered to the other Members-elect. Shortly thereafter Representative Udall, of Arizona, introduced a resolution that the oath be administered to Member-elect Powell and that the question of his final right to be seated as a Member of the 90th Congress be referred to a select committee. The debate on this resolution centered on whether to seat Member-elect Powell or to delay his seating pending a committee investigation. Before a vote was taken, Member-elect Powell was permitted to make a statement to the House. The Udall resolution was replaced by a substitute resolution offered by Representative Ford, of Michigan, which was then adopted as House Resolution 1, 90th Congress, 1st Session.[6]

House Resolution 1 referred to a Select Committee the question of whether or not Mr. Powell should be seated. This Select Committee was to be comprised of nine members selected by The Speaker, four of whom would be members of the minority party, designated by the Minority Leader. The Select Committee was authorized to hold hearings and compel the attendance of witnesses and the production of documents by subpoena. House Resolution 1 prohibited Mr. Powell from being sworn in or seated until the House acted on the Committee report. Mr. Powell, however, was permitted to receive the pay, allowances, and emoluments of a Member during the course of the investigation. The Select Committee was to report to the House within five weeks after its members were appointed.

On January 19, 1967, The Speaker appointed nine lawyer-Members to the bipartisan Select Committee.[7] The Select Committee wrote Mr. Powell on February 1, 1967, inviting him to testify and respond to interrogation before the Committee on February 8, 1967. The stated scope of the testimony and interrogation was to include Mr. Powell's

> qualifications of age, citizenship and inhabitancy, and the following other matters:
>
> (1) The status of legal proceedings to which [Mr. Powell was] a party in the State of New York and in the Commonwealth of Puerto Rico, with particular reference to the instances in which [he had] been held in contempt of court;
>
> (2) Matters of [Mr. Powell's] alleged official misconduct since January 3, 1961.[8]

4. H.R.Rep. No. 27, 90th Cong., 1st Sess. 1-2 (1967) (footnote omitted). The earlier report concluded that Representative Powell and certain staff employees deceived the approving authorities as to travel expenses and that the record raised a strong presumption that the payment of funds to Mr. Powell's wife violated existing law. H.R.Rep No. 2349, 89th Cong., 2d Sess. 6-7 (1966).

5. 113 Cong.Rec. H 4 (daily ed. Jan. 10, 1967). The proceedings on January 10, 1967, in the House are found in *id.* at H 4-16.

6. The roll call vote to bring the Udall resolution to a vote was 126 yeas, 305 nays.

*Id.* at H 13-14. After the Ford substitution was agreed upon, the amended resolution was approved by a roll call vote of 364 to 64. *Id.* at H 16.

7. The Select Committee members were Emanuel Celler (N.Y.) (Chairman), James C. Corman (Calif.), Claude Pepper (Fla.), John Conyers, Jr. (Mich.), Andrew Jacobs, Jr. (Ind.), Arch A. Moore, Jr. (W. Va.), Charles M. Teague (Calif.), Clark MacGregor (Minn.), and Vernon W. Thomson (Wis.).

8. Letter from Emanuel Celler to Adam Clayton Powell, Jr., February 1, 1967, in *Hearings on H.Res. 1 Before Select Comm. Pursuant to H.Res. 1,* 90th Cong.,

The letter further advised Mr. Powell that he could be accompanied by counsel and that the hearings would be conducted in accordance with House Rule XI, paragraph 26.[9]

Mr. Powell appeared at the February 8 hearing, accompanied by his attorneys. At this time the Chairman, Mr. Celler, without objection from Mr. Powell, took official notice of the published hearings and conclusions of the Special Subcommittee on Contracts of the Committee on House Administration, relating to the investigation of Mr. Powell conducted during the 89th Congress. *See* note 4 *supra,* and accompanying text. The Chairman then explained that, in addition to the rights set forth in the letter of February 1, counsel for Mr. Powell would be permitted a reasonable length of time for oral argument and Mr. Powell would be permitted to make a statement to the Committee on all matters as to which he was invited to testify.

Counsel for Mr. Powell moved that the Committee limit its inquiry to Mr. Powell's age, citizenship, and inhabitancy and that, because the scope of the Committee's inquiry was constitutionally limited to these three requirements, it immediately terminate its proceedings and report to the House that Mr. Powell was entitled to his seat.[10] After oral argument on these motions Mr. Powell's counsel made several procedural motions asserting the invalidity of the Committee proceedings for failure to provide adequate notice and comply with the due process requirements of an adversary proceeding. In addition, certain specific procedural rights were requested:

1.  Fair notice as to the charges now pending against him, including a statement of charges and a bill of particulars by any accuser.

2.  The right to confront his accuser, and in particular to attend in person and by counsel, all sessions of this committee at which testimony or evidence is taken, and to participate therein with full rights of cross-examination.

3.  The right fully in every respect to open and public hearings in every respect in the proceedings before the select committee.

4.  The right to have this committee issue its process to summon witnesses whom he may use in his defense.

5.  The right to a transcript of every hearing.[11]

After the Committee took these motions under advisement, Mr. Powell was questioned by counsel for the Committee. After a few questions, Mr. Powell's counsel objected and insisted that Mr. Powell would not proceed further without a ruling on his pending motions. The Select Committee then recessed and, upon reconvening, the Chairman denied all of the

---

1st Sess. 5 (1967) (hereinafter *Hearings*). After a meeting of counsel for Mr. Powell and counsel for the Select Committee held on February 3, 1967, the Committee's chief counsel wrote to Mr. Powell's counsel on February 6, 1967, stating:

[T]he Select Committee desires to interrogate Mr. Powell [as to] paragraphs 1 to 11 of the "Conclusions" contained in the Report of the Committee on House Administration, Special Subcommittee on Contracts (pp. 6 and 7) relating to an investigation into expenditures during the 89th Congress by the House Committee on Education and Labor and the clerk-hire status of Y. Marjorie Flores (Mrs. Adam Clayton Powell). Letter from William A. Geoghegan to Mrs. Jean C. Cahn, February 6, 1967, in *Hearings* 59.

9.  Rule XI, paragraph 26, prescribes committee procedures. In addition to internal housekeeping provisions, it entitles a witness at any hearing to be accompanied by counsel, to submit statements in the discretion of the committee, and to obtain a transcript of testimony, upon payment of costs. H.R.Doc. No. 619, 87th Cong., 2d Sess. 364–368 (1963).

10.  Documentary evidence that Mr. Powell met these three requirements had been previously submitted to the Committee and made part of the record at the hearings. *Hearings* 14–25. Briefs in support of these motions were filed by counsel for Mr. Powell and the American Civil Liberties Union.

11.  *Hearings* 54.

motions. With specific reference to the procedural motions, the Chairman said:

> This is not an adversary proceeding. The committee is going to make every effort that a fair hearing will be afforded, and prior to this date has decided to give the Member-elect rights beyond those afforded an ordinary witness under the House rules.

> The committee has put the Member-elect on notice of the matters into which it will inquire by its notice of the scope of inquiry and its invitation to appear, as well as by conferences with, and a letter from its chief counsel to the counsel for the Member-elect.

> Prior to this hearing the committee decided that it would allow the Member-elect the right to an open and public hearing and the right to transcript of every hearing at which testimony is adduced.

> The committee has decided to summon any witnesses having substantial relevant testimony to the inquiry upon the written request of the Member-elect or his counsel.

> The Member-elect certainly has the right to attend all hearings at which testimony is adduced and to have counsel present at those hearings.[12]

After these rulings by the Chairman, Mr. Powell was interrogated, but upon advice of counsel he refused to answer any questions except those relating to his age, citizenship, and inhabitancy in New York. At the end of the February 8 hearing, the Chairman denied a request that Mr. Powell be permitted to make a statement at that time, suggesting that it should be renewed subsequently.[13]

By a letter of February 10, Mr. Powell was informed that the next hearing would be held on February 14. He was further advised that, upon written application, the Select Committee would summon any witnesses "having substantial relevant testimony to the inquiry. * * *" The letter stated:

> The Select Committee has deferred decision on the question raised by the original motion of your counsel as to whether the qualifications for membership in the House, specifically enumerated in Article I, Section 2, of the Constitution, age, citizenship, and inhabitancy, should be deemed exclusive. Further, we are of the opinion that the Select Committee is required by House Resolution 1, 90th Congress, to inquire not only into the question of your right to take the oath and be seated as a member of the 90th Congress, but additionally and simultaneously to inquire into the question of whether you should be punished or expelled pursuant to the powers granted by the House under Article I, Section 5, Clause 2 of the Constitution. In other words, the Select Committee is of the opinion that at the conclusion of the present inquiry, it has authority to report back to the House recommendations with respect to your seating, expulsion or other punishment.[14]

Finally the letter queried whether in both the seating phase and the punishment and expulsion phase, Mr. Powell would refuse to testify about the legal proceedings against him and his alleged official misconduct. He was again invited to testify and advised he would be allowed to make a statement.

At the hearing on February 14 attended by Mr. Powell's attorneys but not by Mr. Powell, it was stated that Mr. Powell would not testify concerning the court proceedings or alleged official misconduct in either phase of the Committee's inquiry. Mr. Powell's attorneys reasserted their position that age, citizenship, and inhabitancy were the exclusive qualifications, and, further, took the position that no inquiry on the question of punishment or expulsion was possible until a Member had been seated,

12. *Hearings* 59.

13. *Hearings* 107.

14. Letter from Emanuel Celler to Adam Clayton Powell, February 10, 1967, in *Hearings* 110.

and that the two issues—seating and punishment or expulsion—could not be merged into one proceeding.[15] The Select Committee then proceeded to hear evidence concerning the New York litigation involving Mr. Powell and evidence concerning the air travel, expense reimbursement and bank accounts of Mr. Powell and his associates.

Neither Mr. Powell nor his attorneys attended the final hearing of the Select Committee on February 16. At that time testimony was received from Mrs. Adam Clayton Powell (Y. Marjorie Flores) with respect to her financial affairs and those of her husband. Testimony was also received from a former assistant to Mr. Powell concerning disbursements for airplane travel. After the close of the hearings, counsel for Mr. Powell submitted another brief, reiterating the points previously raised.

On February 23, 1967, the Select Committee issued its report. Mr. Powell was found to be over 25 years of age, a United States citizen for more than 7 years, and, on the date of his election, an inhabitant of the State of New York.[16] The Committee also found, however, that Mr. Powell had asserted an unwarranted privilege and immunity from the processes of the courts of the State of New York; had wrongfully and wilfully diverted House funds for use of others and himself, in his capacity as a Member of Congress and as a committee chairman; and had made false reports on expenditures of foreign exchange currency to the Committee on House Administration.[17] Based on these findings of fact, the Select Committee recommended the adoption of a resolution stating:

1. That the Speaker administer the oath of office to the said Adam Clayton Powell, Member-elect from the 18th District of the State of New York.

2. That upon taking the oath as a Member of the 90th Congress the said Adam Clayton Powell be brought to the bar of the House in the custody of the Sergeant-at-Arms of the House and be there publicly censured by the Speaker in the name of the House.

3. That Adam Clayton Powell, as punishment, pay to the Clerk of the House to be disposed of by him according to law, $40,000. The Sergeant-at-Arms of the House is directed to deduct $1,000 per month from the salary otherwise due the said Adam Clayton Powell and pay the same to said Clerk, said deductions to continue while any salary is due the said Adam Clayton Powell as a Member of the House of Representatives until said $40,000 is fully paid. Said sums received by the Clerk shall offset to the extent thereof any liability of the said Adam Clayton Powell to the United States of America with respect to the matters referred to in the above paragraphs 3 and 4 of the preamble to this resolution. [See pp. 584, 585 *infra*.]

4. That the seniority of the said Adam Clayton Powell in the House of Representatives commence as of the date he takes the oath as a Member of the 90th Congress.

5. That if the said Adam Clayton Powell does not present himself to take the oath of office on or before March 13, 1967, the seat of the 18th District of the State of New York shall be deemed vacant and the Speaker shall notify the Governor of the State of New York of the existing vacancy.[18]

The report and proposed resolution of the Select Committee were presented to the House on March 1, 1967.[19] Although notice of this submission had been published in the Congressional Record,[20] Mr.

15. *Hearings* 111–13.

16. The Committee report noted that no question as to Mr. Powell's age or citizenship had been raised but that members of the House and the public questioned his inhabitancy. H.R.REP. No. 27, 90th Cong. 1st Sess. 5 n. 7 (1967).

17. *Id.* at 31–32.

18. *Id.* at 34.

19. The relevant proceedings on March 1, 1967, are found at 113 Cong.Rec. H 1918–57 (daily ed. March 1, 1967).

20. 113 Cong.Rec. D 108 (daily ed. Feb. 24, 1967).

Powell did not appear in the House on March 1. The House extensively debated the proposed resolution, considering, *inter alia,* whether age, citizenship, and inhabitancy were the sole grounds for exclusion from membership in the House; whether the House should first seat Mr. Powell and then determine whether to punish or expel him; and whether a two-thirds vote would be required to exclude him on the basis of the Select Committee's findings. At the conclusion of debate, the House rejected, by a vote of 222 to 202, a motion to bring the resolution to an immediate vote. Mr. Curtis, of Missouri, offered an amendment to the Committee resolution; the thrust of the amendment was to exclude Mr. Powell and declare his seat vacant. At this point The Speaker ruled that a majority vote would be sufficient to pass the resolution if so amended.[21] After further debate this amendment was adopted by a roll call vote of 248 to 176. The amended resolution was then agreed upon, 307 to 116. The Select Committee's proposed preamble was then adopted so that House Resolution 278, 90th Congress, 1st Session, in its final form read:

WHEREAS, The Select Committee appointed Pursuant to H.Res. 1 (90th Congress) has reached the following conclusions:

First, Adam Clayton Powell possesses the requisite qualifications of age, citizenship and inhabitancy for membership in the House of Representatives and holds a Certificate of Election from the State of New York.

Second, Adam Clayton Powell has repeatedly ignored the processes and authority of the courts in the State of New York in legal proceedings pending therein to which he is a party, and his contumacious conduct towards the court of that State has caused him on several occasions to be adjudicated in contempt thereof, thereby reflecting discredit upon and bringing into disrepute the House of Representatives and its Members.

Third, as a Member of this House, Adam Clayton Powell improperly maintained on his clerk-hire payroll Y. Marjorie Flores (Mrs. Adam C. Powell) from August 14, 1964 to December 31, 1966, during which period either she performed no official duties whatever or such duties were not performed in Washington, D. C. or the State of New York as required by law.

Fourth, as Chairman of the Committee on Education and Labor, Adam Clayton Powell permitted and participated in improper expenditures of government funds for private purposes.

Fifth, the refusal of Adam Clayton Powell to cooperate with the Select Committee and the Special Subcommittee on Contracts of the House Administration Committee in their lawful inquiries authorized by the House of Representatives was contemptuous and was conduct unworthy of a Member; Now, therefore, be it

RESOLVED, That said Adam Clayton Powell, Member-Elect from the Eighteenth District of the State of New York, be and the same hereby is excluded from membership in the 90th Congress, and that the Speaker shall notify the Governor of the State of New York of the existing vacancy.

Thereafter, Appellants brought the suit from which the present appeal derives. Because of its importance to the resolution of the issues here presented, some attention must be devoted to the nature of the present claims. By their own statement of this case, Appellants

21. 113 Cong.Rec. H 1942 (daily ed. March 1, 1967). Mr. Curtis, speaking to his proffered amendment, stated:

  During the debate on the resolution, for which this is a substitute, I advanced my own theory on what power was derived from the power of expulsion. I said that I felt the power of expulsion very clearly implied the right of exclusion. I do not see how anyone can argue very seriously against this implied power.

  Also, if this is true, then in my own judgment exclusion would require a two-thirds vote.
  *Ibid.*

sued the Members of the present House of Representatives in a class action. Their complaint in the District Court named Representatives John W. McCormack, Carl Albert, Gerald R. Ford, Emanuel Celler, Arch A. Moore, Jr., and Thomas B. Curtis "individually and, pursuant to Rule 23(a) of the Federal Rules of Civil Procedure, as representatives of a class of citizens who are presently serving in the 90th Congress as members of the House of Representatives." Speaker McCormack was also named in his official capacity. The Clerk of the House of Representatives, the Sergeant-at-Arms and the Doorkeeper were each named individually and in their official capacities.

Appellants' complaint challenged the action of the House by claiming that "House Resolution No. 278 is null and void and in violation of the Constitution of the United States, in particular Article I, Section 2(2) thereof which sets forth the exclusive qualifications for membership in the House of Representatives," and also because "it violates Article I, Section I (2, cl. 1) of the Constitution of the United States which provides that members of the House shall be elected by the people of each state." It further alleged that the House action violated the "basic rights" of the electors of the 18th Congressional District of New York and that, as non-white citizens, these electors were being denied their rights under the fifth, thirteenth, and fifteenth amendments, and, as females, certain of the electors were being denied their rights under the nineteenth amendment. The complaint also attacked House Resolution 278 as a bill of attainder, an ex post facto law and as cruel and unusual punishment. Appellants further asserted that the hearings conducted by the Select Committee violated the fifth and sixth amendments by denying "the elemental rights of due process, including but not limited to notice of charges, the right of confrontation of witnesses, effective representation by counsel who could cross-examine witnesses in regard to any matter alleged. * * * "

Appellants' complaint also challenged the actions of certain of the individuals here sued as follows. Speaker McCormack was alleged to have violated the fifth amendment in declaring a vacancy in the 18th Congressional District contrary to Article I, section 2(4), (5), section 3(6), (7) and section 5(2), and 2 U.S.C. § 8 (1964). The Speaker was also challenged for his refusal to administer the oath to Mr. Powell ("under color and authority of his office and the illegal and unconstitutional actions of the House of Representatives") and for his threat to exclude Mr. Powell from occupancy of his office space. The complaint further stated that the Clerk of the House threatened to refuse to perform the services for Mr. Powell to which a duly-elected Congressman is entitled, that the Sergeant-at-Arms refused to pay Mr. Powell his salary, and that the Doorkeeper threatened to refuse to admit Mr. Powell to the House Chamber.

We take special notice of the manner in which Appellants characterized their action: "this is a proceeding to restrain the enforcement, operation or execution of House Resolution No. 278. * * * " The relief prayed for by the Appellants was that a statutory three-judge court be convened, that it grant a permanent injunction restraining Appellees from executing House Resolution 278, and that it issue a permanent injunction restraining Speaker McCormack from refusing to administer the oath, the Clerk from refusing to perform the duties due a Member of the House, the Sergeant-at-Arms from refusing to pay Mr. Powell, and the Doorkeeper from refusing to admit Mr. Powell to the Chamber. The requested injunction would also restrain the named Representatives "and all other members of the class of citizens they represent who are members of the House of Representatives from taking any action to enforce House Resolution No. 278 or any other action which will deny to plaintiff Adam Clayton Powell, Jr., the right to be seated. * * * " The complaint also asked for declaratory judgment that the denial of his seat violated

the Constitution. In addition, Appellants requested writs of mandamus to require Speaker McCormack to administer the oath of office and to compel the relief requested against the other named officials. Finally, Appellants requested preliminary injunctions granting similar relief pending adjudication of the claims.

After detailed pleading and arguments of counsel, the District Court denied Appellants' application for a three-judge court, dismissed the complaint "for want of jurisdiction of the subject matter," and denied the motion for a preliminary injunction. Powell v. McCormack, 266 F.Supp. 354, 360 (D.D.C.1967). On April 27, 1967, this court denied Appellants' motion for summary reversal. Appellants' petition for writ of certiorari prior to judgment in this court was denied by the Supreme Court on May 29, 1967, Powell v. McCormack, 387 U.S. 933, 87 S.Ct. 2056, 18 L.Ed.2d 995 (1967).

While these legal proceedings were pending Mr. Powell was re-elected to the House of Representatives on April 11, 1967. The formal certification of election was received by the House on May 1, 1967. Mr. Powell has not presented himself again to the House or asked to be given the oath of office.

### Claims and Issues

The issues on this appeal raise profound questions of constitutional law which go to the very heart of our form of government of powers delegated to separate branches by a written constitution. Inextricable are fundamental aspects of our commitment to representative government with elected legislators responsible directly to the people.

Appellants contend:

(a) that dismissal of the complaint in the District Court for want of jurisdiction was error;

(b) that the claims are justiciable;

(c) that refusal to seat Mr. Powell who was over twenty-five years of age, more than seven years a citizen and an inhabitant of New York violated Article I, sections 2 and 5 of the Constitution;

(d) that House Resolution 278 inflicted on Mr. Powell a punishment in violation of the Constitution;

(e) that Mr. Powell's exclusion from the House violated Due Process;

(f) that Mr. Powell's exclusion from the House violated rights of the voters of his district to a free choice of their representative;

(g) that federal courts have power to grant relief requested; and

(h) that the District Court erred in refusing to certify the necessity for a three-judge court.

The Appellees contend:

(a) that the Speech or Debate Clause of Article I is an absolute bar to the action;

(b) that there is no federal subject matter jurisdiction;

(c) that the complaint presents a political question; and

(d) that the claims asserted are not justiciable

### Constitutional Provisions

Because we will have frequent occasion to refer to the text of certain constitutional provisions, we set out here some of the pertinent sections involved in this case:

Art. I, § 2, clause 2: "No Person shall be a Representative who shall not have attained to the age of twenty five Years, and been seven Years a Citizen of the United States, and who shall not, when elected, be an Inhabitant of that State in which he shall be chosen."

Art. I, § 5, clause 1: "Each House shall be the Judge of the Elections, Returns and Qualifications of its own Members, and a Majority of each shall constitute a Quorum to do Business; but a smaller Number may adjourn from day to day, and may be authorized to compel the Attendance of Absent Members, in such Manner, and under such Penalties as each House may provide."

Art. I, § 5, clause 2: "Each House may determine the Rules of its Proceedings, punish its Members for disorderly Behavior, and, with the Concurrence of two thirds, expel a Member."

Art. I, § 6, clause 1: "The Senators and Representatives shall receive a Compensation for their Services, to be ascertained by Law, and paid out of the Treasury of the United States. They shall in all Cases, except Treason, Felony, and Breach of the Peace, be privileged from Arrest during their Attendance at the Session of their respective Houses, and in going to and returning from the same; and for any Speech or Debate in either House, they shall not be questioned in any other Place."

Art. III, § 2, clause 1: "The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority; * * *."

## PART I

### CAN THE COURT ACT?
### JURISDICTION

Historically there have been at least two concepts of the exercise of federal jurisdiction. One is the classical concept that once jurisdiction was found, a court could not decline to act. In Cohens v. Virginia, 19 U.S. (6 Wheat.) 264, 404, 5 L.Ed. 257 (1821), for example, Chief Justice Marshall articulated the view that:

> We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given. The one or the other would be treason to the constitution.

22. Both competing theories are discussed in BICKEL, THE LEAST DANGEROUS BRANCH 46–65 (1962). Professor Bickel himself comes very close to the second concept in his views on prudential techniques for avoiding the exercise of jurisdiction. Bickel, *Foreword: The Passive Virtues*, 75 HARV.L.REV. 40 (1961). A more thorough analysis is set forth in Scharpf, *Judicial Review and the Political Question:*

*See* Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177–178, 2 L.Ed. 60 (1803); Wechsler, *Toward Neutral Principles of Constitutional Law*, 73 HARV.L.REV. 1, 2–9 (1959). A second view is that, where a court finds jurisdiction, it may nevertheless decline to exercise its power. L. HAND, THE BILL OF RIGHTS 14–18 (1958); Finkelstein, *Judicial Self-Limitation*, 37 HARV.L.REV. 338 (1923).[22]

Much of what has been said and written on the concepts of jurisdiction, discretionary jurisdiction, justiciability, case or controversy, and political question, and any effort to fix firm boundaries defining these concepts, is now merged into a series of cases,[23] the most significant of which for our purposes is Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). Almost imperceptibly at first, but quite clearly by the 1962 holding in *Baker*, the Supreme Court had established more comprehensive guidelines for identifying federal subject matter jurisdiction and justiciability. Since the present case turns on a constitutional grant of power to a co-equal branch, the application of these guidelines presents what Mr. Justice Brennan termed in *Baker*, "a delicate exercise in constitutional interpretation," *id.* at 211, 82 S.Ct. at 706.

When a court finds that the subject matter of the case is inappropriate for judicial consideration, *Baker* now establishes that it is nonjusticiable and the court declines to exercise admitted jurisdiction:

> The District Court was uncertain whether our cases withholding federal judicial relief rested upon a lack of federal jurisdiction *or upon the inappropriateness of the subject matter for*

*A Functional Analysis*, 75 YALE L.J. 517 (1966).

23. *See, e. g.*, Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960); Colegrove v. Green, 328 U.S. 549, 66 S.Ct. 1198, 90 L.Ed. 1432 (1946); Coleman v. Miller, 307 U.S. 433, 59 S.Ct. 972, 83 L.Ed. 1385 (1939).

*judicial consideration—what we have designated "nonjusticiability."* The distinction between the two grounds is significant. In the instance of non-justiciability, consideration of the cause is not wholly and immediately foreclosed; rather, the Court's inquiry necessarily proceeds to the point of deciding whether the duty asserted can be judicially identified and its breach judicially determined, and whether protection for the right asserted can be judicially molded. In the instance of lack of jurisdiction the cause either does not "arise under" the Federal Constitution, laws or treaties (or fall within one of the other enumerated categories of Art. III, § 2), or is not a "case or controversy" within the meaning of that section; or the cause is not one described by any jurisdictional statute.

Baker v. Carr, *supra*, at 198, 82 S.Ct. at 700 (emphasis added).

The difficulties arising from the terms used on this elusive subject are suggested by the comments of other members of the Court in *Baker*. Mr. Justice Harlan, for example, described the majority holding as an "abrupt departure * * * from judicial history." He went on to note:

> Once one cuts through the thicket of discussion devoted to "jurisdiction," "standing," "justiciability," and "political question," there emerges a straightforward issue * * *. Does the complaint disclose a violation of a federal constitutional right * * *, a claim over which a United States District Court would have jurisdiction under 28 U.S.C. § 1343(3) and 42 U.S.C. § 1983? The majority opinion does not actually discuss this basic question, but, as one concurring Justice [Stewart] observes, seems to decide it *"sub silentio."* *Ante*, p. 261, 82 S.Ct. p. 733.

Baker v. Carr, *supra*, at 330–331, 82 S. Ct. 691, 771 (Harlan, J., dissenting).

In *Baker*, where the Court was dealing with state action, what the Court said, perhaps as much as what it did, staked out something of the new dimensions of federal subject matter jurisdiction, justiciability, the political question and other doctrines. If *Baker* was, as Mr. Justice Frankfurter thought, "a massive repudiation of the experience of our whole past," *id.* at 267, 82 S.Ct. at 737 (dissenting opinion), it is a holding which points the way for us as to the issues of jurisdiction and justiciability.

Mr. Justice Brennan in *Baker* enumerated three criteria each of which must be present to establish the existence of federal subject matter jurisdiction:

> (1) the cause must "arise under" the Federal Constitution, laws, or treaties (or fall within one of the other enumerated categories of Article III, section 2), and

> (2) the cause must be a "case or controversy" within the meaning of Article III, section 2, and

> (3) the cause must be described in a jurisdictional statute enacted by Congress.

*Id.* at 198, 82 S.Ct. at 700.

1. *Arising Under the Federal Constitution.*

■ Subject to congressional enactment, Article III, section 2, grants federal courts jurisdiction over "all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their authority; * * *." In 1875 Congress used similar language in a statute granting federal courts general and original jurisdiction over such cases. Act of March 3, 1875, ch. 137, § 1, 18 Stat. 470. *See* 28 U.S.C. § 1331(a) (1964). A commentator has recently noted that:

> [t]he key phrase, both in the Constitution and in the statute, is "arises under." Though the meaning of this phrase has attracted the interest of such giants of the bench as Marshall, Waite, Bradley, the first Harlan, Holmes, Cardozo, and Frankfurter, and has been the subject of voluminous scholarly writing, it cannot be said that any clear test has yet been de-

veloped to determine which cases "arise under" the Constitution, laws, or treaties of the United States.

C. Wright, Federal Courts 48 (1963).

Appellants' complaint in the District Court is predicated on the several Article I powers of the House, Article III, and on the Bill of Rights and Civil Rights Amendments. Neither the litigants nor the District Court[24] challenged the substantiality and importance of the constitutional claims, one of the most significant factors in the determination of subject matter jurisdiction.[25] Thus, leaving for subsequent discussion the question of whether the case "arises under" in the context of the statutory grant of jurisdiction, this case would appear to present a substantial claim which arises "directly" under the Constitution,[26] and thus "arises under" in the context of the constitutional grant of jurisdiction of Article III. This conclusion is fortified by the broad reading given to Article III by Chief Justice Marshall in Osborn v. President, etc., Bank of the United States, 22 U.S. (9 Wheat.) 738, 846–858, 6 L.Ed. 204 (1824). See Wright, supra, at 48–52; Chadbourn & Levin, Original Jurisdiction of Federal Questions, 90 U. Pa.L.Rev. 639, 649 (1942).

Appellees argue that the issue presented by this case arises exclusively and finally under Article I, section 5, and thus the case is withdrawn from the judicial power articulated in Article III. Their argument, which has the support of various contemporary constitutional authorities,[27] is that the text of the Constitution—"Each House shall be the Judge of the Elections, Returns and Qualifications of its own Members"— carved out from the Article III judicial powers all jurisdiction of the courts to review congressional judgment under this clause. Stated in another way, Appellees' argument is that the Constitution assigned this special kind of judging function to the Legislative Branch.[28] If so, it is the Constitution's allocation of powers that requires this result, rather than any failure of the claim to arise under the Constitution. Article III grants judicial power to cases "arising under" the Constitution as a whole, not under any particular provision of it.

2. *Case or Controversy.*

It is clear from the debates at the Philadelphia Convention that the Framers intended Article III's requirement of "case or controversy" to mean cases or controversies "of a judiciary nature." E. g., 2 M. Farrand, Records of the Federal Convention of 1787, at 430 (rev. ed. 1966). Analysis of English and Colonial precedents shows that after a long and bitter struggle judicial bodies were denied the power of review over legislative judgments concerning elections and qualifications of members. See 1 H. Remick, The Powers of Congress in Respect to Membership and Elections 1–62 (1929); see generally M. Clarke, Parliamentary Privilege in the Amer-

---

24. Powell v. McCormack, 266 F.Supp. 354, 355–356 (D.D.C.1967).

25. Dismissal of the complaint upon the ground of lack of jurisdiction of the subject matter would, therefore, be justified only if that claim were "so attenuated and unsubstantial as to be absolutely devoid of merit," Newburyport Water Co. v. City of Newburyport, 193 U.S. 561, 579, 24 S.Ct. 553, 557, 48 L.Ed. 795 or "frivolous," Bell v. Hood, 327 U.S. 678, 683, 66 S.Ct. 773, 90 L.Ed. 939. That the claim is unsubstantial must be "very plain." Hart v. B. F. Keith Vaudeville Exchange, 262 U.S. 271, 274, 43 S.Ct. 540, 67 L.Ed. 977.
Baker v. Carr, supra, 369 U.S. at 199, 82 S.Ct. 691 (footnote omitted).

26. Mishkin, The "Federal Question" in the District Courts, 53 Colum.L.Rev. 157, 165–68 (1953).

27. See Frank, Political Questions, in Supreme Court and Supreme Law 36 (E. Cahn ed. 1954); Scharpf, supra note 22, at 539–40; Wechsler, supra, at 8.

28. Appellees' argument finds its logical basis in the classical theory of judicial review previously discussed. Under that view, as Professor Wechsler noted, the primary question is whether the Constitution commits the "autonomous determination" of the issue to another coordinate branch. Wechsler, supra, at 7–9.

ICAN COLONIES (1943); C. WITTKE, THE HISTORY OF ENGLISH PARLIAMENTARY PRIVILEGE (1921). Nothing at the Convention suggests that the "case or controversy" language of Article III was intended to change this familiar and historical allocation of powers. *See* 2 M. FARRAND, *supra,* at 39, 132–33, 186. Indeed, where departures from English precedents were intended they were explicitly written into Article III; for example, the provision extending judicial power to include cases in equity, 2 *id.* at 428.

No cases have been cited as directly holding, and our search has not revealed any basis for saying, that a claim to a seat in the House is of a kind traditionally the concern of courts in the sense, for example, that Mr. Justice Frankfurter viewed traditional cases as those which English courts dealt with at the time of our Convention, Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring); Coleman v. Miller, 307 U.S. 433, 460, 59 S.Ct. 972, 83 L. Ed. 1385 (1939) (Frankfurter, J., concurring); *see* Atlas Life Ins. Co. v. W. I. Southern, Inc., 306 U.S. 563, 568, 59 S.Ct. 657, 83 L.Ed. 987 (1939). All traditions must have a genesis, however, and legal traditions are no exception. One might view Bond v. Floyd, 385 U.S. 116, 87 S.Ct. 339, 17 L.Ed.2d 235 (1966), for example, as departing from existing federal traditions when it found jurisdiction over a state legislator's claim to his seat. It is interesting, however, that nowhere in the opinions of the three-judge *Bond* court

is there any discussion of "case or controversy." Bond v. Floyd, 251 F.Supp. 333 (N.D.Ga.1966). Nor did the Supreme Court opinion in *Bond* elaborate on the "case or controversy" aspect. The presence of a case or controversy was seemingly taken for granted or decided sub silentio. The same is true in Baker v. Carr. Although *Baker* explicitly tabulates "case or controversy" as one of three indispensable factors for jurisdiction, nowhere in that opinion is there any discussion indicating just how the reapportionment of state electoral districts fell within the scope of matters "of a judiciary nature."[29] Yet the holding plainly assumes that a case or controversy was presented.

Against this background we can hardly conclude that Mr. Powell's claim to a seat in the House fails to present a case or controversy as those terms must now be construed.

### 3. *Statutory Grant of Jurisdiction.*

■ Even where the requisites of Article III, section 2 are met—that is, the claim presents a case or controversy which "arises under" the Constitution or laws of the United States—jurisdiction of federal courts is dependent on an affirmative grant by Congress. U. S. CONST. art. III, § 1; Baker v. Carr, *supra,* 369 U.S. at 198, 82 S.Ct. 691; Ex parte McCardle, 74 U.S. (7 Wall.) 506, 19 L. Ed. 264 (1868).

Our examination of the various jurisdictional statutes relied upon by Appellants reveals that jurisdiction can be based only on 28 U.S.C. § 1331(a) (1964),[30] the relevant provision of which

---

**29.** The Court merely stated: "Our conclusion * * * that this cause presents no nonjusticiable 'political question' settles the only possible doubt that it is a case or controversy." Baker v. Carr, *supra,* 369 U.S. at 198, 82 S.Ct. at 700.

**30.** Appellants also rely on the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202 (1964), and the Three Judge Court statute, 28 U.S.C. § 2282 (1964), but it is clear that these statutes are not jurisdictional. Skelly Oil Co. v. Phillips Petroleum Co., 339 U.S. 667, 671–672, 70

S.Ct. 876, 94 L.Ed. 1194 (1950) (declaratory judgment); Cadillac Publishing Co. v. Summerfield, 97 U.S.App.D.C. 14, 227 F.2d 29, cert. denied, 350 U.S. 901, 76 S.Ct. 179, 100 L.Ed. 791 (1955) (same); Van Buskirk v. Wilkinson, 216 F.2d 735 (9th Cir. 1954) (three judge court). The civil rights statutes relied upon, 42 U.S.C. §§ 1971(a) (1), 1981, 1983 (1964), and 42 U.S.C. § 1971(a) (2) (1964), as amended, § 15, 79 Stat. 445 (1965), are not applicable because they deal either with state action or with specific acts of voter discrimination which are not

is: "The district courts shall have original jurisdiction of all civil actions * * * [which arise] under the Constitution, laws, or treaties of the United States." Although there is a paucity of legislative history for the statute, *see generally* FRANKFURTER & LANDIS, THE BUSINESS OF THE SUPREME COURT 65–69 (1927), commentators agree that a broad grant of jurisdiction was intended. Mishkin, *supra* note 26, at 160; Chadbourn & Levin, *supra*, at 644–645 (1942); Forrester, *The Nature of a "Federal Question,"* 16 TULANE L. REV. 362, 374–385 (1942). We have already determined that this case "arises under" the Constitution for the purposes of the Article III definition of judicial power. While section 1331 is not to be equated with the potential for federal jurisdiction in Article III, *see e. g.*, Zwickler v. Koota, 389 U.S. 241, 246–247 n. 8, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967), and cases cited therein, we conclude that the statute is broad enough to operate as an affirmative jurisdictional grant here. *See, e. g.*, Gully v. First Nat'l Bank, 299 U.S. 109, 112–114, 57 S.Ct. 96, 81 L.Ed. 70 (1936); Bergman, *Reappraisal of Federal Question Jurisdiction*, 46 MICH. L. REV. 17, 39–45 (1947).[31]

alleged to have been involved here. Appellants' final jurisdictional predicate, 28 U.S.C. § 1343(4) (1964) is equally unavailing. To the extent that it might confer jurisdiction as to *federal* deprivation of civil rights protected by Acts of Congress, those very acts, we have just noted, are not applicable here.

31. Appellees argue that 28 U.S.C. § 1344 (1964), conferring jurisdiction to recover possession of office but excluding the office of Representative in the House, plainly denied jurisdiction in cases like this. *See* Johnson v. Stevenson, 170 F.2d 108 (5th Cir. 1948), cert. denied, 336 U.S. 904, 69 S.Ct. 491, 93 L.Ed. 1069 (1949). That statute, however, is limited to election disputes. In addition, it requires that the sole question involved arise out of the denial of voting rights on account of race, color or servitude.

For other dismissals based on lack of a jurisdictional statute see Peterson v.

## PART II

### SHOULD THE COURTS ACT? JUSTICIABILITY—DISCRETION TO ACT

█ Having found that under *Baker* jurisdiction arises, we now turn to the inquiry as to the appropriateness or inappropriateness of the subject matter of Appellants' claims for judicial consideration. Absent federal subject matter jurisdiction there would be nothing on which a court could act, but "in the instance of nonjusticiability, consideration of the cause is not wholly and immediately foreclosed; rather, the court's inquiry necessarily proceeds" to determine whether a duty and its breach can be identified and determined and a remedy molded. Baker v. Carr, *supra*, 369 U.S. at 198, 82 S.Ct. at 700.

Appellees argue that the cause presents on its face a "political question."[32] But the fact that a claim seeks the enforcement of a political right or a claim to political office, as here, does not necessarily mean that it raises a "political question." *See, e. g.*, Bond v. Floyd, *supra*. The term "political" has been used to distinguish questions which are essentially for decision by the political branches from those which are essentially for adjudication by the judicial branch.

Sears, 238 F.Supp. 12 (N.D.Iowa 1964) (suit to enjoin voting officials from unlocking voting machines after congressional election); Keogh v. Horner, 8 F.Supp. 933 (S.D.Ill.1934) (suit for writ of prohibition against Governor's issuance of certificate of election of Congressman).

32. The standard authorities on the nature of a "political question" are: Frank, *supra* note 27, at 36–43; POST, THE SUPREME COURT AND POLITICAL QUESTIONS (1936); Field, *The Doctrine of Political Questions in the Federal Courts*, 8 MINN.L.REV. 485 (1924); Finkelstein, *Judicial Self-Limitation*, 37 HARV.L.REV. 338 (1924); Finkelstein, *Further Notes on Judicial Self-Limitation*, 39 HARV.L. REV. 221 (1926); McCloskey, Foreword: *The Reapportionment Case*, 76 HARV.L. REV. 54, 59–64 (1962); Scharpf, *supra* note 22; Weston, *Political Questions*, 38 HARV.L.REV. 296 (1925).

In some areas the political question can be readily discerned; for example, the conduct of foreign policy is vested exclusively in the Executive, *e. g.*, United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 319, 57 S.Ct. 216, 81 L.Ed. 255 (1936); Oetjen v. Central Leather Co., 246 U.S. 297, 302, 38 S.Ct. 309, 62 L.Ed. 726 (1918), whereas the power to declare war or raise armies is vested in the Congress, U. S. CONST. art. 1, § 8. Even in these areas questions can arise on the peripheries so that the labels of "foreign policy" or "state of war" are not automatic barriers to all judicial scrutiny, *e. g.*, The Three Friends, 166 U.S. 1, 63–66, 17 S.Ct. 495, 41 L.Ed. 897 (1897); Baker v. Carr, *supra*, 369 U.S. at 212-213, 82 S.Ct. 691, and cases cited therein. No purpose would be served in pursuing delineation and we refer to it only to indicate that the law does not pivot on labels, even those of constitutional origin.

Appellees stress the applicability of a series of cases containing language indicating that the exercise of congressional power to judge the qualifications of members is beyond the scope of the judicial power, *i. e.*, the courts have no jurisdiction at all. In the cases cited to us, either the issue of jurisdiction was never reached,[33] or the language relied upon is dictum.[34] Nevertheless, we note that they treat this congressional power as exclusive.[35]

The only holding of this court which bears directly on the issue is Sevilla v. Elizalde, 72 App.D.C. 108, 112 F.2d 29 (1940). In *Sevilla*, a resident of the Philippine Commonwealth sought a bill in equity to enjoin the resident commission-er of the Philippines from holding office because he lacked the requisite qualifications. The qualifications were specified in the Independence Act which provided for the resident commissioner to have a seat but no vote in the United States House of Representatives. The court characterized his role as partly a diplomatic resident of a "foreign" state and partly a territorial delegate to Congress. Noting that the question of the qualifications of foreign diplomats was committed to the Executive, and the question of the qualifications of a delegate was committed to Congress, this court held that the case presented a political question:

> Courts have no jurisdiction to decide political questions. These are such as to have been entrusted by the sovereign for decision to the so-called political departments of government, as distinquished from questions which the sovereign has set to be decided in the courts.
>
> \*　\*　\*　\*　\*　\*
>
> Article I, section 5 of the Constitution provides that "each house shall be the judge of the elections, returns and qualifications of its own members \* \* \*." And the Supreme Court has recognized that although these powers are judicial, as distinguished from legislative or executive, in type, they have nevertheless been lodged in the legislative branch by the Constitution.

*Id.* at 111, 116, 112 F.2d at 32, 37. The *Sevilla* holding standing alone might well be dispositive of the instant appeal but it must be read in light of cases since then, culminating in *Baker*.

33. *E. g.*, Seymour v. United States, 77 F. 2d 577, 584, 99 A.L.R. 880 (8th Cir. 1935).

34. Reed v. County Commissioners, 277 U.S. 376, 388, 48 S.Ct. 531, 72 L.Ed. 924 (1928); Jones v. Montague, 194 U.S. 147, 153, 24 S.Ct. 611, 48 L.Ed. 913 (1904); Johnson v. Stevenson, 170 F.2d 108, 110 (5th Cir. 1948), cert. denied, 336 U.S. 904, 69 S.Ct. 491, 93 L.Ed. 1069 (1949); Application of James, 241 F.Supp. 858, 860 (S.D.N.Y.1965); Peterson v. Sears, 238 F.Supp. 12, 13–14 (N.D.Iowa 1964); Keogh v. Horner, 8 F.Supp. 933, 935 (S.D.Ill.1934); In re Voorhis, 291 F. 673, 675 (S.D.N.Y.1923.)

In three of these cases, *Johnson, Peterson,* and *Keogh,* the decision was based on lack of an appropriate jurisdictional statute.

35. For state cases to a similar effect *see* Laxalt v. Cannon, 80 Nev. 588, 397 P.2d 466 (1964); In re Williams' Contest, 198 Minn. 516, 270 N.W. 586 (1936).

The Supreme Court case on which the *Sevilla* court relied in reaching its conclusion is Barry v. United States ex rel. Cunningham, 279 U.S. 597, 49 S.Ct. 452, 73 L.Ed. 867 (1929). There a Senate investigation into the election of a Senator involved the subpoena of a witness to testify as to the source of campaign contributions. He refused to appear and the Senate ordered him arrested and brought to the Chamber. The Supreme Court held that the Senate had the power to bring a witness before it by arrest warrant pursuant to the exercise of its power to judge the qualifications of its Members.[36] More importantly, the Supreme Court noted that the power to judge encompassed the power to "render a judgment which is beyond the authority of any other tribunal to review," *id.* at 613, 49 S.Ct. at 455. See Mr. Justice Douglas' concurring opinion in Baker v. Carr, *supra*, 369 U.S. at 242 n. 2, 82 S.Ct. at 723: "Of course each House of Congress, not the Court, is 'the Judge of the Elections, Returns, and Qualifications of its own Members.'"

Nonjusticiability of a question because it is found to be essentially political is declared by *Baker* to be a doctrine peculiar to confrontations within the *federal* establishment and derives from the fundamental structure of our system of divided and separate powers.[37] In *Baker* and *Bond* any possible confrontation was between federal power and a state. Cautiously avoiding any attempt to state the exclusive criteria for identifying a political question, Mr. Justice Brennan in *Baker* suggested six factors to be found "prominent on the surface" of a political question case. They bear restatement:

    a textually demonstrable constitutional commitment of the issue to a coordinate political department;

    or a lack of judicially discoverable and manageable standards for resolving it;

    or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion;

    or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government;

    or an unusual need for unquestioning adherence to a political decision already made;

    or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

Baker v. Carr, *supra*, at 217, 82 S.Ct. at 710.

Treating these as "symptoms" of a nonjusticiable political question, rather than as the exclusive criteria for identifying one, we turn to their application to this record, having in mind that under *Baker* the presence of any one of these six factors may be a bar to justiciability. This much *Baker* has settled.

(1) Article I, section 5 of the Constitution would seem in plain terms to vest in the House "a textually demonstrable constitutional commitment of the issue" of a judging function concerning the

---

36. In *Barry* the Senate was not judging qualifications in the sense here involved but inquiring into whether, because of fraud and illegal conduct of the candidate, no "election" had been held.

37. [I]n the Guaranty Clause cases and in the other "political question" cases, it is the relationship between the judiciary and the coordinate branches of the Federal Government, and not the federal judiciary's relationship to the States, which gives rise to the "political question."

Baker v. Carr, *supra*, at 210, 82 S.Ct. 706. *See* McCloskey, *supra* note 32, at 62.

Luther v. Borden, 48 U.S. (7 How.) 1, 12 L.Ed. 581 (1849), is the foremost of the guaranty clause cases. Although the dispute there arose within a state, the court focused on the potential conflict between the federal judicial power and the obligation of the legislative and executive branches to fulfill the guaranty clause.

elections, returns and qualifications of its own Members. The language that "Each House shall be the judge" can hardly mean less than that the Members, for this purpose, become "judges," withdrawing judging of qualifications from the judicial branch.

Mr. Powell and the class Appellants contend that what was textually committed to the House by Article I, section 5, was the narrow power to judge whether a Member-elect met the Article I, section 2, criteria of age, citizenship and inhabitancy and no more. On its face, section 5 commits the power to judge qualifications to the House *in some measure*.[38] Although it may not be necessary to decide whether the power is confined to section 2 criteria or limited in some other respect, it is clear that a general power of judging has been committed by the Constitution to the House. If other factors, now to be considered, render the claims inappropriate for consideration, we need not rely on what seems to be a textual commitment.

(2) Are there "judicially discoverable and manageable standards for resolving" the issues raised? Laying aside for the present the availability of an efficient judicial remedy, it would be difficult to say that there are no "manageable standards" for adjudicating the issues raised. Familiar judicial techniques are available to construe the meaning of Article I, section 2, criteria of age, citizenship, and inhabitancy and to decide whether these are the sole grounds on which a Member-elect may constitutionally be excluded. The language of *Baker*, "manageable standards for resolving" the claims, must, however, be read in light of the earlier formulation inquiring "whether protection for the right asserted can be judicially molded." When we consider whether the available "manageable standards" are adequate for resolving the question

in the sense of solving and settling it, we are forced to conclude that courts do not possess the requisite means to fashion a meaningful remedy to compel Members of the House to vote to seat Mr. Powell or to compel The Speaker to administer the oath.

(3) This case does not present aspects to which the third criterion of *Baker* applies since the determination of the scope of a constitutional grant of power is not an "initial policy determination of a kind clearly for nonjudicial discretion," such as a declaration of war.

(4) It is difficult to see, assuming a decision favorable to Mr. Powell, that there could be an efficient judicial resolution which was contrary to the action of the House "without expressing lack of respect due coordinate branches of government." Appellants urge that the courts should not concern themselves with the prospect of a direct confrontation because Members of the House, or a majority of them, would as a matter of comity, respect a holding of this court and abide by its rulings. The issue is not, however, what reaction could be expected from the coordinate branch, but the nature of the judicial mandate requested.

(5) There does not seem to be present, except as it arises out of paragraphs (1) and (4) above, "an unusual need for unquestioning adherence to a political decision already made." This fifth criterion of *Baker* has no direct relevance here as it would for example to a specific foreign policy determination within the scope of Executive power. *See, e. g.,* Chicago & Southern Air Lines, Inc. v. Waterman S. S. Corp., 333 U.S. 103, 68 S.Ct. 431, 92 L.Ed. 568 (1948); Eminente v. Johnson, 124 U.S.App.D.C. 56, 361 F.2d 73, cert. denied, 385 U.S. 929, 87 S.Ct. 287, 17 L.Ed.2d 211 (1966); Pauling v. McNamara, 118 U.S.App.D.C.

---

38. Deciding whether a matter has *in any measure* been committed by the Constitution to another branch of government, or whether the action of that branch exceeds whatever authority has been committed, is itself a delicate exercise in constitu-

tional interpretation, and is a responsibility of this Court as ultimate interpreter of the Constitution.
Baker v. Carr, *supra*, at 211, 82 S.Ct. at 706 (emphasis added).

50, 331 F.2d 796 (1963), cert. denied, 377 U.S. 933, 84 S.Ct. 1336, 12 L.Ed.2d 297 (1964).

(6) There is, in only a limited sense, and perhaps not at all in the sense contemplated by *Baker,* a "potentiality of embarrassment from multifarious pronouncements by various departments on one question." However, if we view the risk of conflicting pronouncements by the House and the courts as within this criterion, the potential for embarrassment is rather obvious. A judicial mandate to seat Mr. Powell would in effect be a command to The Speaker to administer the oath contrary to the terms of House Resolution 278. The command to seat Mr. Powell might be obviated were we to hold that our mandate constituted an "equity substitute" for a resolution of the House, the effect of which would be to treat him as having been sworn and seated. But the resulting confusion from such conflicting pronouncements seems clear.

It would therefore appear that not one but probably several of the *Baker* "symptoms" of nonjusticiability are prominent on the surface of the claims asserted and indeed are inextricable from them; this alone might well be sufficient to warrant a conclusion of "the inappropriateness of the subject matter for judicial consideration." Baker v. Carr, *supra,* 369 U.S. at 198, 82 S.Ct. at 700. *Baker,* it will be recalled, emphasizes the difference between jurisdiction and justiciability. After stating that the distinction "is significant," the Court noted:

> In the instance of nonjusticiability, consideration of the cause is not wholly and immediately foreclosed; rather, the Court's inquiry necessarily proceeds to the point of deciding *whether the duty asserted can be judicially identified and its breach judicially determined, and whether protection for the right asserted can be judicially molded.*

*Ibid* (emphasis added).

If we read "duty" and "breach" in the conventional judicial sense, good arguments can be advanced that we can judicially identify the asserted duty of the House to seat a qualified Member-elect, and that a breach of such a duty can, in the abstract, be judicially determined. We will assume, *arguendo,* that these hurdles are cleared. However, when we come to the next inquiry, "whether protection for the right asserted can be judicially molded," we are confronted with problems quite different from and indeed not present in adjudications of conventional equitable claims or claims involving state action. Although Professor Wechsler was not pointing to precisely the problem we have here, his characterization of political questions is apropos: "what is crucial * * * is not the nature of the question but the nature of the answer that may validly be given by the courts." Wechsler, *supra,* at 15.

In *Baker,* the Supreme Court concluded that protection for the rights arising under the equal protection clause could be molded, saying "we have no cause at this stage to doubt the District Court will be able to fashion relief * * *." Baber v. Carr, *supra,* at 198, 82 S.Ct. at 699. No further elucidation of this is found in the Court's opinion. The only other reference to the scope and mechanics of the relief to be molded is the comment of Mr. Justice Douglas that "any relief accorded can be fashioned in the light of well-known principles of equity." *Id.* at 250, 82 S.Ct. at 727 (Douglas, J., concurring opinion).

Can the District Court mold relief which will protect the rights here asserted? Looking first to the complaint in the District Court, we find that after the prayer for a three-judge court, the complaint asks judgment:

(1) to enjoin execution of House Resolution 278;

(2) to require The Speaker of the House to administer the oath to Mr. Powell;

(3) to enjoin all Members of the House from any action to enforce Resolution

278 or otherwise to deny Mr. Powell his seat;

(4) for declaratory judgment declaring House Resolution 278 null and void;

(5) for injunctive and mandatory relief addressed to non-elected employees of the House relating to access to the House, pay, and other perquisites of the office of a Member.

Any judgment which enjoined execution of House Resolution 278, or commanded the Speaker of the House to administer the oath, or commanded Members of the House as to any action or vote within the Chamber would inevitably bring about a direct confrontation with a co-equal branch and if that did not indicate lack of respect due that Branch, it would at best be a gesture hardly comporting with our ideas of separate co-equal branches of the federal establishment. These circumstances would give rise to a classic political question and fall within the definition of such a question under *Baker*. On this record, therefore, the claims of Appellants for coercive equitable relief are inappropriate for judicial consideration.

### Appropriateness of Subject Matter for Declaratory Relief

■ Although we have determined that we cannot mold relief in coercive form, we next consider Appellants' claims for a declaratory judgment independent of the coercive equitable relief sought.[39] *Cf.* Zwickler v. Koota, 389 U.S. 241, 253–254, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967). The Declaratory Judgment Act provides:

> In a case of actual controversy within its jurisdiction, except with respect to Federal taxes, any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201 (1964).[40]

A declaratory judgment is *sui generis,* neither strictly legal nor equitable, United States Fidelity & Guaranty Co. v. Koch, 102 F.2d 288, 290–291 (3d Cir. 1939). In common with equitable relief, however, it recognizes judicial competence to declare rights without imposing a duty to do so, *i. e.,* its exercise is discretionary. Public Affairs Associates, Inc. v. Rickover, 369 U.S. 111, 112, 82 S.Ct. 580, 7 L.Ed.2d 604 (1962).[41] It is clear that this discretion must be exercised judiciously and cautiously, with regard for the circumstances of the case and the purpose of a declaratory judgment. The Supreme Court recently noted:

> [T]he propriety of declaratory relief in a particular case will depend upon

39. One of the reasons, not present here however, that declaratory relief should be considered independently of other relief is the fact that coercive relief "looks only to some immediate need, whereas the declaration of rights, by clarifying the legal relations, has prospective value in stabilizing the legal position. * * *" BORCHARD, DECLARATORY JUDGMENTS 433 (2d ed. 1941).

40. All authorities agree that the purpose of a declaratory judgment is to settle actual controversies before they ripen into violations of law or breaches of duty and to afford relief from uncertainty and insecurity by a "premature" adjudication. *See, e. g.,* BORCHARD, *supra* note 39, at 299; Luckenbach S.S. Co. v. United States, 312 F.2d 545 (2d Cir. 1963);

Scott-Burr Stores Corp. v. Wilcox, 194 F.2d 989 (5th Cir. 1952).

41. *See* Zemel v. Rusk, 381 U.S. 1, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965); Public Service Commission v. Wykoff Co., 344 U.S. 237, 73 S.Ct. 236, 97 L.Ed. 291 (1952); Eccles v. Peoples Bank, 333 U. S. 426, 68 S.Ct. 641, 92 L.Ed. 784 (1948); Great Lakes Dredge & Dock Co. v. Huffman, 319 U.S. 293, 63 S.Ct. 1070, 87 L.Ed. 1407 (1943); Brillhart v. Excess Ins. Co., 316 U.S. 491, 62 S.Ct. 1173, 86 L.Ed. 1620 (1942); Lampkin v. Connor, 123 U.S.App.D.C. 371, 360 F.2d 505 (1966); Marcello v. Kennedy, 114 U.S.App.D.C. 147, 312 F.2d 874 (1962), cert. denied, 373 U.S. 933, 83 S.Ct. 1536, 10 L.Ed.2d 692 (1963).

a circumspect sense of its fitness *informed by the teachings and experience concerning the functions and extent of federal judicial power.*

Public Service Commission v. Wykoff, *supra* note 41, 344 U.S. at 243, 73 S.Ct. at 240 (emphasis added). Some of the same factors which led us to hold that judicial consideration of the claims was not appropriate, dictate a holding that we decline to undertake declaratory relief. Declaratory relief in this case is particularly inappropriate since it could not finally terminate the controversy,[42] indeed, it might well tend to resurrect the very conflict our holding of inappropriateness seeks to avoid.[43] Our conclusion is reinforced by Mr. Justice Frankfurter's opinion in Colegrove v. Green, 328 U.S. 549, 66 S.Ct. 1198, 90 L.Ed. 1432 (1946), which, although modified in other aspects by *Baker* and its progeny, remains relevant with respect to the discussion of declaratory judgments:

> And so, the test for determining whether a federal court has authority to make a declaration such as is here asked, is whether the controversy "would be justiciable in this Court if presented in a suit for injunction * * *." Nashville, C. & St. L. R. Co. v. Wallace, 288 U.S. 249, 262, 53 S.Ct. 345, 348, 77 L.Ed. 730, 87 A.L.R. 1191.

*Id.* at 551–552, 66 S.Ct. at 1199. *See also* Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 57 S.Ct. 461, 81 L.Ed. 617 (1934); 6A MOORE, FEDERAL PRACTICE ¶ 57.-14, at 3078 (2d ed. 1964) ("The Declaratory Judgment Act does not attempt, nor can it be used to avoid this fundamental judicial principle [political questions].").

### The Claims of Voters

We cannot be unmindful of the claims which relate to the highly important constitutional rights to vote and to be represented by the choice reflected by the voting process. These are by no means unimportant claims. The "right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." Reynolds v. Sims, 377 U.S. 533, 555, 84 S.Ct. 1362, 1378, 12 L.Ed.2d 506 (1964); *see* Wesberry v. Sanders, 376 U.S. 1, 13, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964). The right of all voters who meet a state's qualifications to vote is protected by the Constitution and by congressional acts, Ex Parte Yarbrough, 110 U.S. 651, 4 S.Ct. 152, 28 L.Ed. 274 (1884); United States v. Classic, 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941), and the qualifications established by the states may not discriminate either in terms of race or color, U.S. CONST. amend. XV, or in terms of sex, U. S. CONST. amend. XIX, or by weighing unfairly the votes of those in one geographical area or electoral district over the votes of others, *e. g.,* Wesberry v. Sanders, *supra.*

The rights so protected, however, relate to the initial right to vote—the right to say who shall be the representative. They do not directly extend to the right to have that particular representative be seated in Congress under all circumstances. The Constitution itself, as we have noted earlier, sets explicit limits on the right of electors to have whomever they choose sit in Congress: it fixes eligibility requirements of age, citizenship and inhabitancy in Article I, section 2; additionally Congress can determine the times, places and manners of holding the elections under Article I, section 4; and Congress is granted exclusion and expulsion powers. Certainly these provisions make clear that the carefully guarded right to vote for whomever the elector desires does not necessarily carry

42. *Cf.* Cha-Toine Hotel Apartments Bldg. Corp. v. Shogren, 204 F.2d 256, 258 (7th Cir. 1953); United States v. Jones, 176 F.2d 278, 280 (9th Cir. 1949).

43. *See* Sellers v. Johnson, 69 F.Supp. 778, 786 (S.D.Iowa 1946), rev'd on other grounds, 163 F.2d 877 (8th Cir. 1947), cert. denied, 332 U.S. 851, 68 S.Ct. 356, 92 L.Ed. 421 (1948); Doehler Metal Furniture Co. v. Warren, 76 U.S.App. D.C. 60, 129 F.2d 43 (1942) (dictum).

with it a concomitant right to have that person seated in the Congress. In United States v. Classic, *supra*, the Court made clear that the right is not absolute: "That the free choice by the people of representatives in Congress, subject only to the restrictions to be found in §§ 2 and 4 of Article I *and elsewhere in the Constitution*, was one of the great purposes of our constitutional scheme of government cannot be doubted," *id.* at 316, 61 S.Ct. at 1038 (emphasis added).[44]

We have already noted that the holding in Bond v. Floyd, *supra*, was bottomed on state action which imposed a penalty on Bond for exercising his first amendment rights to discuss public issues. The Supreme Court's rationale would apply equally if Bond had been excluded from the state university because of his speeches. The Court did not reach the question of the standing of Bond's constituents to assert claims on their own behalf. *Id.* 385 U.S. at 137 n. 14, 87 S.Ct. 339. The class Appellants have not argued their claims in terms of first amendment rights, but lurking in the language of the Court in *Bond* can be detected some hint of a possible relationship between first amendment rights to political expression and the related right of voters to have their views articulated for them in Congress.[45]

The essence of representative government is the one speaking for the many; hence the rights of those who are to be represented must always be accorded high standing and any infringement must be carefully scrutinized. Nevertheless, we have seen that even this crucial right is hedged in by various restrictions which arise out of the Constitution itself. The same Constitution which guarantees the right to expression and the right to vote also limits the powers of courts.

The right to vote is not an academic right; its primary objective is frustrated when the person elected cannot assume the powers and responsibilities of office. Nevertheless, the subject matter of Mr. Powell's claim and the voting claims of the class Appellants are so interrelated that neither can be regarded as having an existence entirely independent of the other; in the context of this case, they stand or fall together. It must follow that as Mr. Powell's claims are inappropriate for judicial consideration, so also are those of the class Appellants.

Our conclusion that the subject matter of the suit is inappropriate for judicial consideration is not inconsistent with the conclusion of Judge Hart. Powell v. Mc-Cormack, 266 F.Supp. 354 (D.D.C.1967). He found that the subject matter embraced a "political question" under *Baker*

---

44. We think the language of the court in Barry v. United States ex rel. Cunningham, *supra*, while not directly dealing with the right to vote as here developed, is relevant to the relationship between the power of Congress to exclude or expel and the right of a citizen to vote:

The equal representation clause is found in Article V, which authorizes and regulates amendments to the Constitution, "provided, * * * that no state, without its consent, shall be deprived of its equal suffrage in the Senate." This constitutes a limitation upon the power of amendment, and has nothing to do with a situation such as the one here presented. The temporary deprivation of equal representation which results from the refusal of the Senate to seat a member pending inquiry as to his election or qualifications is the necessary consequence of the exercise of a constitutional power, and no more deprives the state of its "equal suffrage" in the constitutional sense than would a vote of the Senate vacating the seat of a sitting member or a vote of expulsion.

*Id.* 279 U.S. at 615–616, 49 S.Ct. at 455–456.

45. The germ of this concept can be found in the language of the Court in *Bond* that a legislator's speech is protected so that the people may hear from their legislator and "also so they may be represented in governmental debates by the person they have elected." Bond v. Floyd, *supra*, at 136–137, 87 S.Ct. at 349–350. *See also* Meiklejohn, *The First Amendment Is an Absolute*, 1961 SUP.CT.REV. 245, 254; Comment, 35 U.CHI.L.REV. 151, 170–172 (1967).

and relied on this to conclude that there was no jurisdiction. Our application of *Baker* leads to the conclusion that the presence of a "political question" does not invariably preclude jurisdiction but rather affords a basis for declining to exercise it. The decisions of the District Court and of this court both are bottomed on concepts of separation of powers.[46]

## PART III

### THE SPEECH OR DEBATE CLAUSE

Appellees treat the Speech or Debate Clause under their argument on jurisdiction and urge that it bars any court from questioning Members of the House of Representatives, individually or collectively, with respect to legitimate legislative activities and that this includes the exercise of their constitutional responsibility to vote on the seating of a Member-elect. Treatment of this claim has been deferred because it is not entirely clear whether it goes to jurisdiction or some other bar to granting the relief sought. For our purposes we need not resolve that classification. Since two of the four Supreme Court holdings on the Clause are barely two years old the point merits some comment.

The Clause confers personal immunity on each Member of the House but it is not strictly a personal right since its purpose is to protect the legislative process in our system of representative government. The broad sweep of the bar is suggested by what the Supreme Court said about a legislator's burdens of responding to and defending a suit growing out of his legislative activities in Tenney v. Brandhove, 341 U.S. 367, 377, 71 S.Ct. 783, 788, 95 L.Ed. 1019 (1951):

> Legislators are immune from deterrents to the uninhibited discharge of their legislative duty, not for their private indulgence but for public good. * * * The privilege would be of little value if they could be subjected *to the cost and inconvenience and distractions of a trial* upon a conclusion of the pleader, or to the hazards of a judgment against them based on a jury's speculation as to motives. (Emphasis added.)

The language of Article I, section 6, clause 1 is simply that "for any Speech or Debate in either House, they [Members] shall not be questioned in any other Place." That Clause had its genesis in the English Bill of Rights proclaimed by the Parliament of 1688–89.[47] The

---

46. As I read the concurring observations of my colleagues, a majority agrees on the essential holdings that (a) the court has jurisdiction, (b) the claims in this case are inappropriate for judicial consideration, and (c) a three-judge court was not required. *Baker* is definitive, it is recent, and it is authoritative; and there is no need to press beyond the new outer limits it establishes for jurisdiction, justiciability and political questions. I do not express a view as to whether exclusion may be accomplished for reasons outside section 2 criteria, nor do I rely on *the fact* that more than two-thirds of the House voted for Resolution 278 in its final form. The Speaker had made a ruling that a simple majority was sufficient and it is the essence of speculation to place any reliance on the quantum of the vote as actually cast. The Speaker ruled that Members were voting on exclusion, not on expulsion. The contention which merges exclusion and expulsion powers seems to me part of what is inappropriate for judicial consideration.

47. "That the freedom of speech, and debates or proceedings in Parlyament ought not to be impeached or questioned in any court or place out of Parlyament." 1 Will. & Mary s. 2, c. 2 (1689), reprinted in T. TASWELL-LANGMEAD, ENGLISH CONSTITUTIONAL HISTORY 449, 451 (Plucknett ed. 1960).

The privilege of freedom of speech and debate was first included in the Speaker's petition to the King requesting certain Parliamentary privileges in 1541. An earlier indication of this privilege occurred during the reign of Richard II, when a member of Parliament who had introduced a bill containing reflections upon the King's extravagance was condemned to death. In a subsequent reign, the member's petition to annul the judgment on the ground that it was introduced and debated in Parliament was granted. C. WITTKE, THE HISTORY OF ENGLISH PARLIAMENTARY PRIVILEGE 23–24 (1921).

As is pointed out in United States v. Johnson, 383 U.S. 169, 182–183 n. 13, 86

struggles arising in England were re-enacted in the American colonies where immunity for acts within the legislative chambers was asserted by the colonial lawmakers, *see* JOURNALS OF THE HOUSE OF BURGESSES OF VIRGINIA: 1727–1740, at 242 (1910); *see generally,* M. CLARKE, PARLIAMENTARY PRIVILEGE IN THE AMERICAN COLONIES 93–97 (1943). Indeed, the Supreme Court as recently as 1951 noted that "[f]reedom of speech and action in the legislature was taken as a matter of course by those who served the Colonies from the Crown and founded our Nation." Tenney v. Brandhove, *supra,* at 372, 71 S.Ct. at 786.[48]

So well known and accepted was this legislative immunity doctrine that the records of the Constitutional Convention show it was written into Article I without opposition or debate.[49] The objectives of the delegates can be gleaned from the writings of James Wilson, perhaps the most influential member of the Committee on Detail which drafted the provision for the convention:

In order to enable and encourage a representative of the publick to dis-

charge his publick trust with firmness and success, it is indispensably necessary, that he should enjoy the fullest liberty of speech, and that he should be protected from the resentment of everyone, however powerful, to whom the exercise of that liberty may occasion offense.

2 WORKS OF JAMES WILSON 421 (McCloskey ed. 1967).

The scope of the Clause has been considered by the Supreme Court four times. First, in Kilbourn v. Thompson, 103 U.S. 168, 26 L.Ed. 377 (1880), the plaintiff, a recalcitrant witness before a House committee, was arrested and imprisoned by the Sergeant-at-Arms pursuant to a resolution of the House. The Supreme Court held that, although the imprisonment of Kilbourn was indeed unlawful, the Speech or Debate Clause constituted a bar to civil claims against the Speaker and the Members of the House, *id.* at 205, 26 L.Ed. 377.[50]

It seems to us that the views expressed in the authorities we have cited are sound and are applicable to this

S.Ct. 749, 15 L.Ed.2d 681 (1966), language similar to that ultimately codified in 1688 was adopted in a statute of 1513, 4 Henry VIII, c. 8, as a result of the prosecution of Strode, a member of the House of Commons, for introducing certain mining legislation in which he had a personal interest. All of the early cases reveal a struggle between privilege and prerogative—between King and Parliament or its members whom the King believed to be meddling in non-Parliamentary affairs. The struggle reached culmination in the prosecution of Eliot and other members of Commons for making seditious speeches and conspiring to restrain the Speaker from adjourning the session. The defendants pleaded Strode's Act but the court held it to be a private bill. Eliot's Case, 3 How.St.Tr. 294, 309 (1629). Thereafter, in 1667, Parliament declared Strode's Act to be a general law. *See* T. TASWELL-LANGMEAD, *supra,* at 246–50, 377–78.

48. That the privilege was firmly embedded in English practice is revealed from Blackstone's writings:

For, as every court of justice hath laws and customs for its direction, some

of the civil and canon, some of the common law, others their own peculiar laws and customs, so the high court of parliament hath also its own peculiar law, called the *lex et consuetudo parliamenti.* * * * It will be sufficient to observe that the whole of the law and custom of Parliament has its original from this one maxim, "that whatever matter arises concerning either house of parliament, ought to be examined, discussed, and adjudged in that house to which it relates, and not elsewhere.

1 BLACKSTONE'S COMMENTARIES *163.

49. The first notation of the Clause comes from a document in James Wilson's handwriting, considered by the Committee on Detail. 2 M. FARRAND, RECORDS OF THE FEDERAL CONVENTION OF 1787, at 156 (rev. ed. 1966). Subsequent documents contain the first full expression of the Clause as it was reported to the convention and adopted. 2 *id.* at 166, 181, 246.

50. The Court remanded the case as to the officers of the House, and plaintiff eventually recovered against them, Kilbourn v. Thompson, 11 Dist.Col. (MacArthur & Mackey) 401 (1883).

case. It would be a narrow view of the constitutional provision to limit it to words spoken in debate. The reason of the rule is as forcible in its application to written reports presented in that body by its committees, *to resolutions* offered, which, though in writing, must be reproduced in speech, *and to the act of voting,* whether it is done vocally or by passing between the tellers. In short, to things generally done in a session of the House by one of its members in relation to the business before it.

*Id.* at 204, 26 L.Ed. 377 (emphasis added).

Tenney v. Brandhove, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951), was the second case to come before the Supreme Court on the Speech or Debate Clause. Brandhove was called to testify before a state legislative committee and when he refused to respond was held in contempt. The Supreme Court relied upon the general doctrine of legislative immunity, reflected in Article I, to insulate the members of the state legislature from suit. The opinion focused on the historical immunity of legislators from civil or criminal liability for their exercise of the privileges of speech and debate, within the sphere of legitimate legislative activity. *Id.* at 377–378, 71 S.Ct. 783.

In the third case to reach the Supreme Court, United States v. Johnson, 383 U.S. 169, 86 S.Ct. 749, 15 L.Ed.2d 681 (1966), a former Congressman challenged his conviction for violation of federal conflict of interest laws and conspiracy, asserting the immunities of the Clause. The conspiracy count was based in part on a speech delivered by him in the House, for which the Congressman was found to have received substantial sums of money claimed by the prosecution to be a bribe. The Fourth Circuit reversed and Chief Judge Sobeloff phrased the issue in terms of jurisdiction:

> This is the first case, within our knowledge, squarely raising the question whether the congressional privilege deprives a court of jurisdiction to try a member on a criminal charge of accepting money to make a speech in the House of which he is a member.

337 F.2d 180, 186 (4th Cir. 1964).

In affirming the Fourth Circuit the Supreme Court accepted the linkage of the Article I Clause with the English and Colonial precedents, characterizing its adoption into Article I as a culmination of the

> history of conflict between the Commons and the Tudor and Stuart monarchs during which successive monarchs utilized the criminal and civil law to suppress and intimidate critical legislators.

383 U.S. at 178, 86 S.Ct. at 754. That the Clause must be "read broadly to effectuate its purposes," is made abundantly clear:

> [T]he privilege was not born primarily of a desire to avoid private suits such as those in *Kilbourn* and *Tenney,* but rather to prevent intimidation by the executive and accountability before a possibly hostile judiciary.

*Id.* at 181, 86 S.Ct. at 755. The Supreme Court did not discuss the claim of Johnson in jurisdictional terms.[51]

---

51. The entire thrust of the opinion suggests that the holding rests on the fact that a criminal indictment charged a Member of the House with conduct basely motivated—"precisely what the Speech or Debate Clause generally forecloses from executive and judicial inquiry." United States v. Johnson, 383 U.S. 169, 180, 86 S.Ct. 749, 755 (1966). If Appellants' claims are read as asserting that the votes of the House Members were racially motivated it is clear that the Supreme Court views motives of legislators, however unworthy, as irrelevant. Mr. Justice Frankfurter's statement in *Brandhove* is sweeping:

> The claim of an unworthy purpose does not destroy the [Speech or Debate] privilege. * * * The holding of this Court in Fletcher v. Peck, 6 Cranch 87, 130, 3 L.Ed. 162, that it was not consonant with our scheme of government for a court to inquire into the motives of legislators, has remained unquestion-

The most recent of the four cases involving the Clause is Dombrowski v. Eastland, 387 U.S. 82, 87 S.Ct. 1425, 18 L.Ed.2d 577 (1967). This court affirmed summary judgment for the defendants in a suit against a Senate Committee Chairman and its chief counsel for injunctive relief and damages flowing from an alleged conspiracy between the defendants and Louisiana state officials to seize property and records of the petitioners in violation of their fourth amendment rights. Dombrowski v. Burbank, 123 U.S.App.D.C. 190, 358 F.2d 821 (1966) (per curiam). The Supreme Court affirmed as to the Committee Chairman. It reversed and ordered a new trial only as to the chief counsel:

> It is the purpose and office of the doctrine of legislative immunity, having its roots as it does in the Speech or Debate Clause of the Constitution, Kilbourn v. Thompson, 103 U.S. 168, 204, 26 L.Ed. 377 (1881), that legislators engaged "in the sphere of legitimate legislative activity", Tenney v. Brandhove, *supra*, 341 U.S. 367, at 376, 71 S.Ct. 783, 95 L.Ed. 1019, should be protected not only from the consequences of litigation's results *but also from the burden of defending themselves*.

387 U.S. at 84–85, 87 S.Ct. at 1427 (emphasis added).

If the Members of the House who are Appellees here cannot be "questioned in any other Place," it would seem that they need not *answer* in any other place, including courts. From this it is arguable that had the class defendants elected to ignore the complaint, the District Court might have had an obligation to apply

*sua sponte* the bar of the Clause; however, we need not decide that point.

Having in mind the breadth accorded the Clause in *Kilbourn, Tenney* and *Dombrowski* and the "prophylactic purposes of the clause," United States v. Johnson, *supra,* 383 U.S. at 182, 86 S.Ct. 749, it would seem, although we need not decide, that, however characterized, the Clause would operate as a bar to the maintenance of this suit.[52]

## PART IV

### THREE JUDGE COURT

■ In their complaint in the District Court, Appellants applied for the convening of a three-judge court pursuant to 28 U.S.C. § 2282 (1964).[53] The District Court denied the application on the ground that a resolution of one House, such as House Resolution 278, excluding Appellant Powell from the House was not an "Act of Congress" within the meaning of the statute. Powell v. McCormack, 266 F.Supp. 354, 355 (D.D.C. 1967). *Cf.* Krebs v. Ashbrook, 275 F. Supp. 111, 118 (D.D.C.1967).

The District Court's conclusion is amply supported by the plain meaning of "Act of Congress" as used in the statute and by the legislative history and purpose of section 2282. The decided cases demonstrate that

> [t]he legislative history of § 2282 and of its complement, § 2281, requiring three judges to hear injunctive suits directed against federal and state legislation, respectively, indicates that these sections were enacted to prevent a federal judge from being able to paralyze totally the single operation

---

ed. See cases cited in State of Arizona v. State of California, 283 U.S. 423, 455, 51 S.Ct. 522, 526, 75 L.Ed. 1154. Tenney v. Brandhove, *supra,* 341 U.S. at 377, 71 S.Ct. at 788.

52. In both *Kilbourn* and *Dombrowski* money damages were sought and officers of the House and Senate were held not to share the absolute immunity accorded Members. In the instant case Appellants seek, not money damages, but extraordinary coercive equitable relief

against employees of the House directly contrary to commands of the House itself.

53. Section 2282 provides: "An interlocutory or permanent injunction restraining the enforcement, operation or execution of any Act of Congress for repugnance to the Constitution of the United States shall not be granted by any district court or judge thereof unless the application therefor is heard and determined by a district court of three judges under section 2284 of this title."

of an entire regulatory scheme, either state or federal, by issuance of a broad injunctive order.

Kennedy v. Mendoza-Martinez, 372 U.S. 144, 154, 83 S.Ct. 554, 560, 9 L.Ed.2d 644 (1963) (footnote omitted). *See* Zemel v. Rusk, 381 U.S. 1, 7 n. 4, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965); Phillips v. United States, 312 U.S. 246, 248–251, 61 S.Ct. 480, 85 L.Ed. 800 (1941). The legislative purpose is not served by construing the statute to cover the resolution in this case since the statute is to be construed narrowly. Bailey v. Patterson, 369 U.S. 31, 33, 82 S.Ct. 549, 7 L.Ed.2d 512 (1962). House Resolution 278 is a resolution of one House only and relates to the organization and internal governing of the House of Representatives. It creates no broad statutory scheme which would be frustrated by injunctive relief, and it does not contain the attributes of the usual "Act of Congress" which involves the House of Representatives, the Senate, and the President.[54]

## CONCLUSION

Our disposition of this appeal on the ground that the claims are nonjusticiable because of the inappropriateness of the subject matter for judicial consideration, makes it unnecessary to reach the claims on the merits. Nevertheless, some mention of the conflicting views is appropriate.

Debate on the scope and meaning of Article I, sections 2 and 5 began at Philadelphia and has engaged the attention of legal writers, including Members of both Houses, ever since. As with the debates over other issues arising under the Constitution, this debate has not been and possibly never will be judicially resolved. To vest in the members of a legislative body the powers intimated in the literal language of section 5 "to be the Judge" of matters as significant as the exclusion and expulsion of members plainly involves risks. Professor Chafee parades some of the horrendous possibilities which from time to time have been suggested:

> If it [Congress] can add crime or disloyalty acts as bars, it can add profiteering as well. * * * A majority * * * can raise the minimum age to fifty * * * bar men of Jewish race, * * * require that members must be already enrolled in either the Republican or the Democratic Party, or recognize only a single party entitled to nominate candidates. There is no line to be drawn, once the legislature is allowed to cross the constitutional limits. It can turn our democracy into an oligarchy by imposing high property qualifications, or into a dictatorship of the proletariat by declaring ineligible all persons deriving income from rents and invested capital.

Z. CHAFEE, FREE SPEECH IN THE UNITED STATES 255 (1942).

But Professor Chafee acknowledges that there is much to be said for the view that requirements other than those of section 2 must be embraced in the less precise language of section 5 that each House is to be "Judge" of the qualifications of its Members. He concludes by saying that neither of the extreme views, *i. e.,* no exclusion power except for section 2 reasons, or unrestricted exclusion powers, is sound and that the actual practice and usage has long taken an intermediate ground.

---

54. Although there are no direct holdings in point, prior case law supports the District Court's conclusion. In Krebs v. Ashbrook, 275 F.Supp. 111 (D.D.C. 1967). Rule XI of the House of Representatives, the charter of the House Un-American Activities Committee, was held not to be an "Act of Congress" within the meaning of the statute. *Contra* Stamler v. Willis, 371 F.2d 413 (7th Cir. 1966).

Since we predicate our holding on the absence of an Act of Congress as required by the statute, we are not required to reach the alternative grounds suggested by Appellees, that even assuming that House Resolution 278 is an Act of Congress, a single district judge may dismiss the action for lack of federal jurisdiction. *See* Lion Mfg. Co. v. Kennedy, 117 U.S. App.D.C. 367, 330 F.2d 833 (1964); *cf.* Reed Enterprises v. Corcoran, 122 U.S. App.D.C. 387, 354 F.2d 519 (1965).

As to elected persons satisfying all the requirements in the Constitution, we are not forced to choose between giving the House absolute power to unseat whomever it dislikes, and giving the voters absolute power to seat whomever they elect. A third alternative has been adopted, fairly close to the second view. The constitutional qualifications ordinarily suffice; but Congress has rather cautiously imposed some additional tests by statute,[55] and the House of Representatives or the Senate has probably added a very few more qualifications by established usage (a sort of legislative common law) to cover certain obvious cases of unfitness.

*Id.* at 257.

Great reliance is placed by Appellants on the views of Professor Charles Warren, another constitutional writer. Professor Warren views section 2 as fixing the only qualifications for membership in the House. Referring to the Convention's refusal to adopt "the proposal to give Congress power to establish qualifications in general [or adopt] * * * the proposal for a property qualification," he concludes:

Such action would seem to make it clear that the Convention did not intend to grant to a single branch of Congress, either to the House or to the Senate, the right to establish any qualifications for its members, other than those qualifications established by the Constitution itself, viz., age, citizenship, and residence. For certainly it did not intend that a single branch of Congress should possess a power which the Convention had expressly refused to vest in the whole Congress. As the Constitution, as then drafted, expressly set forth the qualifications of age, citizenship, and residence, and as the Convention refused to grant to Congress power to establish qualifications in general, the maxim *expressio unius est exclusio alterius* would seem to apply.

C. WARREN, THE MAKING OF THE CONSTITUTION 421 (1937) (footnote omitted).

The protagonists for the conflicting views on the scope of exclusion powers of the House draw on the various aspects of history, custom and usage which support their respective positions.[56] Most of this, of course, is addressed to what are the merits of the claims asserted by Appellants. Reference to these unresolved constitutional questions is made in order to indicate their scope and nature and to underscore what it is that we do not decide.

Conflicts between our co-equal federal branches are not merely unseemly but often destructive of important values.

55. Professor Chafee's reference to a "statute" is not followed by any citation. It may be that he had reference to a statute enacted in the Civil War period prescribing an oath of past loyalty, Act of July 2, 1862, ch. 128, 12 Stat. 502, or to a statute which forever renders a Senator, Representative, department head, or other officer of the government incapable of holding office under the United States if such person receives compensation for services in any matter in which the government is a party, Act of June 11, 1864, ch. 119, 13 Stat. 123; *see* Burton v. United States, 202 U.S. 344, 26 S.Ct. 688, 50 L.Ed. 1057 (1906).

56. *E.g.*, Z. CHAFEE, *supra*, at 241–69; C. WARREN, *supra*, at 412–26; Wechsler, *supra*, at 8. Background historical material is set forth in 1 BLACKSTONE'S COMMENTARIES *162–163, *175–77; M. CLARKE, *supra*, at 174–205, 236–62; THE

FEDERALIST No. 60, at 409 (Cooke ed. 1961) (Hamilton); J. GREENE, THE QUEST FOR POWER: THE LOWER HOUSES OF ASSEMBLY IN THE SOUTHERN ROYAL COLONIES 171–204 (1963); C. WITTKE, *supra*, at 55–74, 90–171. The relevant English cases, including the famous case of John Wilkes, are found in GLANVILLE, REPORTS OF CERTAIN CASES DETERMINED AND ADJUDGED IN PARLIAMENT (1776).

The instances in which the House of Representatives considered exclusions or expulsions are found in 1 A. HINDS, PRECEDENTS OF THE HOUSE OF REPRESENTATIVES 381–591 (1907); 2 A. HINDS, *supra*, at 795–860; 6 C. CANNON, PRECEDENTS OF THE HOUSE OF REPRESENTATIVES 50–63 (1935). *See* Hupman, *Senate Election, Expulsion and Censure Cases*, S.Doc. No. 71, 87th Cong., 2d Sess., (1962); 1 H. REMICK, *supra*, at 116–332.

In the interpretation of provisions which are pregnant with such conflicts the unavailability of a remedy and the consequences of any unresolved confrontation between coordinate branches weigh heavily in pointing to a conclusion either that no jurisdiction was intended or that if jurisdiction exists it should not be exercised.

The checks and balances we boast of can check and balance just so far. The Framers had hard choices in many areas. To allow, for example, total immunity for speech, debate and votes in the Congress risked irreparable injury to innocent persons if false or scurrilous charges were made on the floor of a Chamber; to allow the Executive exclusive power of foreign relations risked unwise policies which might lead to war; to tolerate the essential supremacy of constitutional interpretation in a Supreme Court meant the risk of unwise decisions by a transient majority. But that is the way our system is constructed. Under stress what some may think are weaknesses turn out to be strengths and the wisdom of Framers in dividing the spheres of delegated power becomes clear.

That each branch may occasionally make errors for which there may be no effective remedy is one of the prices we pay for this independence, this separateness, of each co-equal branch and for the desired supremacy of each within its own assigned sphere. When the focus is on the particular acts of one branch, it is not difficult to conjure the parade of horrors which can flow from unreviewable power. Inevitably, in a case with large consequences and a paucity of legal precedents, advocates tend to raise the spectre of hypothetical situations which would be permitted by the result they oppose. Our history shows scant evidence that such dire predictions eventuate and the occasional departures in each branch have been thought more tolerable than any alternatives that would give any one branch domination over another. That courts encounter some problems for which they can supply no solution is not invariably an occasion for regret or concern; this is an essential limitation in a system of divided powers. That courts cannot *compel* the acts Appellants would have us order in this case recedes into relative insignificance alongside the blow to representative government were judges either so rash or so sure of their infallibility as to think they should command an elected co-equal branch in these circumstances.

We should resist the temptation to speculate whether and under what circumstances courts might find claims to a seat in Congress which would be justiciable. We do well to heed the admonition of Mr. Justice Miller, uttered nearly a century ago, that judges confine themselves to the case at hand:

It is not necessary to decide here that there may not be things done, in the one House or the other, of an extraordinary character, for which the members who take part in the act may be held legally responsible. If we could suppose the members of these bodies so far to forget their high functions and the noble instrument under which they act as to imitate the Long Parliament in the execution of the Chief Magistrate of the nation, or to follow the example of the French Assembly in assuming the function of a court for capital punishment we are not prepared to say that such an utter perversion of their powers to a criminal purpose would be screened from punishment by the constitutional provision for freedom of debate.

Kilbourn v. Thompson, *supra* 103 U.S. at 204–205, 26 L.Ed. 377.

The judgment appealed from is

Affirmed.

McGOWAN, Circuit Judge (concurring separately):

My colleagues and I reach a common result, that is to say, (1) a three-judge court was not required for the reasons stated by Judge Burger, and (2) we do not think it either necessary or appropriate to direct the District Court to reinstate the complaint and to determine af-

ter trial whether the particular relief sought should be given. Because this second determination involves considerations peculiarly committed to judicial discretion, it is not surprising that, although our identification and weighing of relevant factors presents some overlap, each of us has preferred to characterize in his own words the route he has travelled.[1]

This record demonstrates to me that, from the beginning, Representative Powell's view of the Constitution has explicitly and continuously been that, so long as he possesses the requisite qualifications of age, citizenship, and inhabitancy, his right to serve in the House is solely a matter between him and his constituents, not his colleagues. If the voters of his district do not like his conduct in office, they can turn him out at the next election; or, if that conduct be thought violative of the criminal laws, the proper authorities can seek indictments. But, so his reasoning proceeds, for his colleagues to make that conduct the occasion for severance of their association together in the House would be, without observance of the amending process, to add further qualification requirements to the three now stated in the Constitution.

Thus it was that, although the Select Committee expressly informed him that the scope of its inquiry included both (1) his qualifications in terms of age, citizenship, and inhabitancy, and (2) alleged misconduct in office warranting expulsion or other punishment, he persist-

ently refused to answer any questions or supply any information except with respect to (1). Somewhat belatedly, he sought to fortify his legal position by asserting that the Committee could, at most, take up (2) only after he had been seated, even though he was at the moment of that claim continuing to receive full pay and other allowances and emoluments. But there is no reason to think that, had the Committee deferred the second aspect of its inquiry until after seating, his basic constitutional position would have been abandoned.

In the context of the kind of misconduct in office involved here,[2] I regard that position as untenable. In saying this, I distinguish very sharply between conduct abusing the privileges of House membership, on the one hand, and status or speech, on the other. If the House were to withhold recognition of a member because of his race, or religion, or political or philosophical views, there would indeed have been an addition to qualifications without benefit of constitutional amendment. But the allegations in the complaint which suggest that this is such a case are so purely conclusory in character as, under elemental pleading concepts, not to require a hearing on the merits.

Appellant Powell's cause of action for a judicially compelled seating thus boils down, in my view, to the narrow issue of whether a member found by his colleagues, after notice and opportunity for hearing, to have engaged in official mis-

---

1. For example, the allegedly exclusive power of the House to pass upon the fitness of a member, and the claimed reach of the Speech and Debate Clause, have played no part whatsoever in my vote. I do not profess to know what their precise constitutional meaning is, nor do I say that they are wholly without relevance to a discretionary declination of jurisdiction. I simply have not found it necessary to take them into account in my determination.

2. It is argued that the misconduct cannot be assumed because Powell was denied procedural due process by his colleagues in the investigation of his activities. But

no one can read the record of the Select Committee's relationships with Powell without concluding that there was no serious purpose upon Powell's part to participate in the ascertainment of the facts. This was unquestionably due to his fundamental constitutional theory that he was accountable for his conduct only to his constituents. One cannot escape the impression that any procedural problems would have been resolved satisfactorily if there had been willingness to accept the relevance of the alleged misconduct to his continuance in the House. Against this background, I see no need to reinstate the complaint solely to pursue the procedural issues.

conduct must, because of the accidents of timing, be formally admitted before he can be either investigated or expelled. The sponsor of the motion to exclude stated on the floor that he was proceeding on the theory that the power to expel included the power to exclude, provided a ⅔ vote was forthcoming. It was.[3] Therefore, success for Mr. Powell on the merits would mean that the District Court must admonish the House that it is form, not substance, that should govern in great affairs, and accordingly command the House members to act out a charade.

■ Our already overtaxed courts arguably have more pressing work to do than this, including the hearing and determination of serious and substantial claims of deprivations of civil rights. The only question really presented by this complaint is whether the House must go through the formality of seating a member before it expels him for official misconduct. Unlike the District Court, I am prepared to say that even such a narrow issue confers subject-matter jurisdiction in the familiar sense of (a) a claim arising under the Constitution, (b) a case or controversy, and (c) a statute founding jurisdiction. But the Supreme Court in Baker v. Carr was at pains to make clear that the *existence* of jurisdiction does not invariably require its *exercise*. The question is one of whether, under all the circumstances and with a wise regard for the nature and capabilities of judicial power and for the respect it must always command, the court is bound to hear and determine a complaint on its merits.[4]

■ The challenged action by the House in this case reflects in substance an equation by it of its power to expel for legislative misconduct by a ⅔ vote with a power to deny seating for the same reason and by the same vote. That action was rooted in the judgment of the House as to what was necessary or appropriate for it to do to assure the integrity of its legislative performance and its institutional acceptability to the people at large as a serious and responsible instrument of government. That is a judgment which, on this record, presents no impelling occasion for judicial scrutiny.

LEVENTHAL, Circuit Judge:

■■ I concur in the result. Judge Burger's opinion presents the background

3. It is true that the Speaker, after inquiry to the Parliamentarian, announced that the motion would carry on a majority vote. All this suggests to me is that, in this instance, Representative Curtis was a better parliamentarian than the Parliamentarian. In any event, the result conformed to the more exacting standard; and for me to guess whether the result would have been different if the Speaker's ruling had been different would be to engage in the speculation Judge Burger deplores (fn. 46).

As to Judge Burger's implication that I have gotten into the merits, I note only that he, having decided that the words of the Constitution vest in the House the power to judge a member's fitness, concludes that jurisdiction may be declined to review its exercise in this instance. I, having read the text of the Constitution as declaring a power in the House to expel a member for misconduct in office by a ⅔ vote, conclude that jurisdiction may be declined to pursue the narrower question of whether the Constitution requires that the House must first seat before it expels. It would appear that each of us has, preliminarily to concluding whether jurisdiction must be exercised, gone no further in deciding questions of "textual commitment" than is contemplated by the majority opinion in Baker v. Carr.

4. The factors that are relevant to this kind of a determination obviously include the nature of the relief sought—in this case, injunction, mandamus, and declaratory judgment. All have traditionally been regarded as reposing peculiarly in the discretion of the court and as subject to denial, even after hearing on the merits, for reasons unrelated to the merits. The potential embarrassments and confusions, both within the House and between it and the judicial and executive branches, inevitable upon their grant in this case are worthy of sober remark. These and like matters are legitimately the setting in which are to be considered the urgencies, in terms of simple justice, of the bringing to bear of judicial power.

of this case in detail. I agree with some aspects of his opinion—particularly the conclusions in Part I and Part IV. As to other aspects, I am either in disagreement or find it unnecessary to define my position. It would unduly protract and delay our disposition for me to make a point by point analysis. Accordingly I confine myself at this time to a relatively sparse, almost topic-sentence, statement of my approach, as follows:

1. The complaint on its face presents a matter within the subject-matter jurisdiction of the District Court. It alleges a claim arising under the Constitution, there is a case or controversy, and there exists a Federal statute giving district courts jurisdiction to consider such a case, namely, 28 U.S.C. § 1331. The fact that this is a novel law suit does not negative jurisdiction. Baker v. Carr. 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).

2. I do not feel required to decide appellees' contention that the case lacks justiciability, a concept that I think was developed in Baker v. Carr as defining the kind of case or issue that is inherently inappropriate for determination by any court.

For example, I am not prepared to say at this juncture that a complainant charging an unconstitutional exclusion from Congress avowedly put on racial or religious grounds cannot obtain a declaratory judgment or other relief. Nor do I consider whether appellant Powell may have available other judicial remedies.

3. In my view the issue presented by the complaint is of such a nature that dismissal is appropriate in the exercise of sound judicial discretion.

Plaintiffs were seeking remedies— mandamus; equity decree; declaratory judgment—each of which is not necessarily automatically available to one asserting (and even establishing) the underlying right. In an action seeking such remedies a court has discretion in deciding whether, when and how far to consider the merits.[1]

4. For present purposes I assume appellants are correct in their assertion that Article I, Section 5, Cl. 1 of the Constitution is exclusive in stating conditions of eligibility for Congressmen. But that does not mean that appellant Powell was immune from exclusion on grounds that would justify expulsion under Article I, Section 5, Cl. 2.

The record before us shows that the exclusion by the House of appellant Powell was by a vote of 307 to 116, on a motion put forward by its sponsor, Congressman Thomas Curtis of Missouri, on the ground that Mr. Powell's conduct was such as to warrant his expulsion under Article I, Section 5, Cl. 2 of the Constitution if he were seated, and that he should therefore be excluded at the outset.

Certainly members of the House, who cannot be questioned in court for action taken within a "sphere of legitimate legislative activity," [2] can, without being

1. See Abbott Laboratories v. Gardner, 387 U.S. 136, 148, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); Public Affairs Associates, Inc. v. Rickover, 369 U.S. 111, 82 S.Ct. 580, 7 L.Ed.2d 604 (1962).

2. Tenney v. Brandhove, 341 U.S. 367, 376, 71 S.Ct. 783, 95 L.Ed. 1019 (1951), quoted in Dombrowski v. Eastland, 387 U.S. 82, 84, 85, 87 S.Ct. 1425, 18 L.Ed.2d 577 (1967), confirms the principle inherent in separation of powers that such action is not subject to judicial scrutiny or cognizance.

Compare the rule establishing immunity from suit of judges of courts of general jurisdiction, considered a fundamental re-

quirement of an independent judiciary. Bradley v. Fisher, 13 Wall. (80 U.S.) 335, 351, 20 L.Ed. 646 (1871), holds that such judges "are not liable to civil actions for their judicial acts, even when such acts are in excess of their jurisdiction, and are alleged to have been done maliciously or corruptly." The Court also stated (pp. 351–352, 20 L.Ed. 646) : "Where there is clearly no jurisdiction over the subject-matter any authority exercised is a usurped authority, and for the exercise of such authority, when the want of jurisdiction is known to the judge, no excuse is permissible." In Pierson v. Ray, 386 U.S. 547, 554, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967) the Court referred with approval

subject to court disapproval, expel a member they find to have mis-used travel credit cards, and kept on his payroll a person (his wife) who resided neither in his District nor in the District of Columbia. The fact that the House is not a court, with power to enter a judgment of conviction for violation of laws, does not preclude it from concluding that the pertinent acts were committed by the Congressman, as a part of an ultimate determination of lack of fitness for service in the House, a determination entrusted to the House by Article 1, Section 5, Clause 2 of the Constitution.

5. Appellant Powell seems to have been of the view that whatever grounds the House may have had to expel him once he was seated, they could not be used as grounds to exclude him without seating him.

On this point I think that in a case like Powell's where the record (including reports of legislative committees) provides abundant indication that there was at least a substantial question of misconduct in Congressional office, the view of Congressman Curtis was permissible under the Constitution, and appellants' contention to the contrary must be rejected.

As to the interim period, I am at least reassured by the provision in H.R.Res. 1 of the 90th Congress, 1st Sess., adopted after debate in which Mr. Powell participated, that pending the investigation and report by the Select Committee and House action thereon Mr. Powell was to receive the pay, allowances and emoluments authorized for Members of the House, though he was not to be sworn in or occupy a seat in the House.

As to the right of the other appellants to be represented during the interim period, they stand on no higher ground

than the claim of appellant Powell to be seated.[3]

Appellants say in rebuttal, *inter alia,* that the theory advanced by Congressman Curtis is not available to appellees since the House did not accept the need for a ⅔ vote, which Mr. Curtis recognized as essential. The Speaker announced, on a parliamentary inquiry, that only a majority vote was required for exclusion of appellant Powell.

This contention is not without force. But assuming, *arguendo,* that the procedure used to exclude Powell may have been improper that does not mean he is entitled to maintain an action for discretionary relief of a nature that brings a court close to confrontation with members of the coordinate legislative branch of government. Thus, a court may decline to entertain an action based on such a procedural defect unless it appears not only that the defect may have been prejudicial but also that it probably was prejudicial, at least where as here the relief sought is extraordinary.

6. The fact that the House voted exclusion by a ⅔ vote is not irrelevant, even assuming the majority ground rule was improper for it at least generates a substantial doubt that a court declaration would provide Powell his seat—even assuming as I think we should, that the House would respect the court's declaratory judgment. *Compare* Bond v. Floyd, 385 U.S. 116, 87 S.Ct. 339, 17 L.Ed.2d 235 (1966). The House could immediately exclude on the same ground, by the same vote.

True, the House could do this, by hypothesis, only if the "ground rule" were that a ⅔ vote was necessary. But it does not appear that appellant Powell ever staked his position on the need for a ⅔ ground rule.

to Bradley v. Fisher, and referred to the historic immunities of judges and legislators as "equally well established."

3. *See* Barry v. United States ex rel. Cunningham, 279 U.S. 597, 616, 49 S.Ct. 452, 456, 73 L.Ed. 867 (1929): "The temporary deprivation of equal representation which results from the refusal of the

Senate to seat a member pending inquiry as to his election or qualifications is the necessary consequence of the exercise of a constitutional power, and no more deprives the state of its 'equal suffrage' in the constitutional sense than would a vote of the Senate vacating the seat of a sitting member or a vote of expulsion."

7. It is significant that appellant Powell, though duly re-elected in April 1967, has not availed himself of the legislative remedy available with this re-election to assert his claim to represent his district.

On the argument for stay Powell's counsel indicated that at least one reason, and apparently a major reason, why appellant Powell did not invoke that legislative remedy is that it would not maintain his seniority and chairmanship. Perhaps so, but a court would be going to the extreme edge of its authority if it were to declare his status as a Congressman. It cannot reasonably be asked to provide such extraordinary relief to enable complainant to obtain perquisites, however important, that are essentially a matter for legislative determination, and certainly are not assured by any constitutional clause. A court has a duty, in the sound exercise of discretion, to consider litigation seeking relief that raises problems of confrontation with a coordinate branch with an approach that will, wherever possible, confine relief narrowly.

8. If Powell had acquiesced in the premise that there was authority to exclude, but only by a ⅔ vote and ⅔ ground rule, there would likely have been a very different kind of legislative situation. He could not consistently have stood on the position that the House and its Select Committee were acting beyond the proper sphere of authority by considering matters other than age, citizenship and residence. He may have been unwilling to wage battle even on a ⅔ ground rule after a hearing that admittedly was warranted in inquiring into various financial and salary arrangements. The premise of permissible exclusion would have undercut the position that permitted him to defer as a matter of principle any explanation of those arrangements.

9. The various objections lodged by appellant Powell to the procedure of the House Committee must all be viewed in the light of his then position that the Committee's scope was restricted to the three issues of age, citizenship and residence. It cannot be assumed that procedural differences would have loomed as large, or been unmanageable, if appellant Powell had accepted what I think was a valid premise of the House and its Committee. That premise—which I uphold by a ruling on the merits on this issue—is that the Constitution gives the House legislative "jurisdiction," even prior to seating a member-designate, to make inquiry as to whether he has committed acts justifying punishment or expulsion of a member.

10. My approach may not hang tidily on the pegs of jurisprudence thus far called to my attention. It makes sense to me, however, and labels and concepts can emerge in due course.

What seems to have received most discussion in recent years is the concept of justiciability as a requirement in addition to subject-matter jurisdiction. As I read them the discussions of justiciability and non-justiciability have emerged primarily in terms of whether the issue is of a kind that lies within any province of any court at any time. I refrain from accepting absolutes about the case before us—to lay it down flatly either that no court may consider the issue and rule differently from the House, or that there may not be a state of facts that would properly call upon the District Court to grant declaratory and perhaps other relief. There are recent decisions indicating that when there is a determination of both subject-matter jurisdiction and justiciability for the issues, the courts are required to decide the issues and to vindicate the applicant's constitutional rights—to refrain from sidestepping this duty merely because the framing of judicial relief presents large difficulties,[4] and to take cognizance of a case seeking declaratory relief even where an injunction cannot properly be obtained.[5] By strict logic the same approach should

---

4. Wesberry v. Sanders, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964).

5. Zwickler v. Koota, 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967).

apply when there is a hypothesis of justiciability or at least a disinclination to enter a ruling of non-justiciability. Yet there have been instances when the courts have bypassed crucial jurisdictional issues and disposed of cases on the merits.[6] I think the spirit of those cases also justifies the course I follow—of deciding the merits on one key point and yet refraining, in the exercise of discretion, a full adjudication on the merits.

The key point, to me, is that Congressman Powell erred in his assumption that his satisfaction of the Constitutional requirements (of residence, citizenship and age) meant that he had to be seated, and that grounds justifying expulsion could only be applied to those who had already been seated. My ruling on the merits of this Constitutional issue leads to the conclusion that the House had legislative jurisdiction to consider and appraise the activities and fitness of appellant Powell at the time he presented his credentials. It is not a full adjudication of the merits of the claim of appellant Powell that he was wronged. It does not necessarily mean either that the House acted properly when it failed to heed the ground rule of a ⅔ vote put forward by Congressman Curtis as the assumption of his motion to exclude, or that a court considering a different prayer for relief would be disabled from saying so upon a full consideration of Powell's case on its merits.

The case before us presents problems of confrontation with a coordinate branch and of molding relief. These are considerations that lead a court in some instances to find non-justiciability of the issue for any court.[7] They may also properly be invoked, I think, as backdrop and perspective for a ruling to decline to provide a full adjudication on the merits, even assuming justiciability. My reasoning is that the confrontations would likely have evolved in a quite different way if appellant Powell had recognized a power to exclude on grounds of misconduct (albeit on ⅔ vote) and had conducted himself on this premise from the start. Hence I do not think it mandatory for a court to consider and determine the constitutional issue as he has chosen to frame it, from an erroneous premise; and specifically, I think it proper to refrain from a full determination of the merits in a case where petitioner is seeking an extraordinary remedy yet has failed to invoke to the fullest extent the remedies and procedures available within the legislative branch.

---

6. *See, e. g.*, Secretary of Agriculture v. Central Riog Ref. Co., 338 U.S. 604, 619–620, 70 S.Ct. 403, 94 L.Ed. 381 (1950); Ex parte Bakelite Corp., 279 U.S. 438, 448, 49 S.Ct. 411, 73 L.Ed. 789 (1929).

7. Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).